Andrew LYONS, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 82410.

Supreme Court of Missouri,
En Banc.

Jan. 31, 2001.

Rehearing Denied March 20, 2001.

William J. Swift, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Shaun J. Mackelprang, John M. Morris, Asst. Attys. General, Jefferson City, for Respondent.

COVINGTON, Judge.

Appellant, Andrew Lyons, was convicted of two counts of murder in the first degree, section 565.020.1, RSMo 1994, and one count of involuntary manslaughter, section 565.024.1, RSMo 1994. This Court affirmed the convictions and sentences. *State v. Lyons*, 951 S.W.2d 584 (Mo. banc 1997), *cert. denied*, 522 U.S. 1130, 118 S.Ct. 1082, 140 L.Ed.2d 140 (1998). Appellant then filed for post-conviction relief under Rule 29.15, which the motion court denied after conducting an evidentiary hearing consisting largely of depositions and other exhibits. On appeal, appellant raises six points of error. Affirmed.

## I.

On direct appeal this Court summarized the facts as follows. *Lyons*, 951 S.W.2d at 587. As of September 1992, Andrew Lyons and Bridgette Harris had been living together for three years in Cape Girardeau, Missouri. Their eleven-month old son, Dontay, lived with them, as did Bridgette's two children from a previous relationship, seven-year-old Demetrius and four-year-old Deonandrea. Approximately one week before the murders, Lyons told a longtime friend that he was having problems with Bridgette. Lyons told the friend that "he just felt like killing" and that the "best thing for [Bridgette] to do ... was to get killed...." Around the same time, Bridgette moved out of the

house she shared with Lyons. She and the three children moved in with Bridgette's mother, Evelyn Sparks.

Two days before the murders, Lyons drove his truck alongside Bridgette and her older sister while they were walking on a sidewalk. He stopped the truck and pulled forward the passenger's seat, revealing a shotgun. The women ran away and reported the incident to the police.

The day before the murders, Lyons told another friend that Evelyn was interfering with his relationship with Bridgette and that "she should leave them alone or he would kill her." That night, he told Bridgette's best friend that "I am going to end up killing [Evelyn] ." Around midnight, Lyons told yet another friend that he was going to shoot Evelyn with his shotgun and "catch a train out of here."

On the morning of Sunday, September 20, 1992, Lyons went to Evelyn's house, where Bridgette was staying. He and Bridgette argued. Lyons left, went back to his house, and grabbed his shotgun and a duffel bag packed with clothes and ammunition. Shortly after 10 a.m., Lyons returned to Evelyn's house. Evelyn was in the kitchen. Bridgette, Demetrius, Deonandrea, and Dontay were downstairs in the basement. Demetrius heard a loud noise from upstairs and went to see what had happened. On his way, he passed Lyons coming down the stairs carrying a shotgun. Demetrius saw his grandmother lying on the kitchen floor and ran to his room. In the basement, Lyons shot Dontay once and shot Bridgette once.

Lyons then drove to the house where his half-brother, Jerry DePree, was staying. Lyons asked DePree to follow him to the house of his friends John and Gail Carter so that he could drop off his truck. Upon arriving at the Carters' house, Lyons went in to talk to Gail. He told her that he had killed Bridgette and Evelyn and that he had shot Dontay by accident. Lyons went back outside and transferred the shotgun and duffel bag from his truck to DePree's car. Lyons got into DePree's car and told

him to drive away. DePree asked him what was wrong, and Lyons told him that he had shot some people and that the police would probably be looking for him. DePree dropped Lyons off at Trail of Tears State Park. Lyons left his shotgun in DePree's car.

Back at Evelyn Sparks's house, another of Evelyn's daughters arrived around 11 a.m. She found her mother on the kitchen floor and called the police. The police discovered Bridgette and Dontay in the basement. All three were dead. Evelyn died from massive hemorrhaging and tissue destruction caused by a gunshot wound above her left hip. Bridgette died from massive hemorrhaging and tissue destruction caused by a gunshot wound below her right shoulder. Dontay died from extensive brain tissue damage secondary to a contact gunshot wound to the left eye.

When DePree learned later in the day that Evelyn, Bridgette, and Dontay had been shot to death, he turned over Lyons's shotgun to the police. The shell casing found in the shotgun and two shell casings found at Evelyn's house matched the shell casings of cartridges fired from the shotgun by the State's firearms examiner.

Lyons was arrested in the afternoon and confessed to having shot Evelyn, Bridgette, and Dontay that morning. At trial, the jury found Lyons guilty of murder in the first degree for the deaths of Evelyn Sparks and Bridgette Harris and guilty of involuntary manslaughter for the death of Dontay Harris. The jury could not agree on a punishment for the murder of Evelyn Sparks. The jury recommended a sentence of death for the murder of Bridgette Harris and seven years incarceration for the death of Dontay Harris. The trial court sentenced Lyons to death for the murder of Evelyn Sparks and accepted the jury's recommendations as to the deaths of Bridgette and Dontay. This Court affirmed appellant's convictions and sentences.

## II.

In reviewing a denial of post-conviction relief, this Court's review is limited to a determination of whether the motion court's findings of fact and conclusions of law are clearly erroneous. *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). Findings of fact and conclusions of law are only clearly erroneous if, after review of the whole record, the Court is left with a definite and firm impression that a mistake has been made. *Id.*

In each of appellant's points, he alleges ineffective assistance of counsel. Appellant claims that his counsels' ineffective assistance violated appellant's right to effective assistance of counsel, due process, a fair trial, a fair and impartial jury, and to be free from cruel and unusual punishment as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 10, 18, and 21 of the Missouri Constitution.

To prevail on an ineffective assistance of counsel claim, a movant must " 'show that counsel's representation fell below an objective standard of reasonableness.' " *Moss*, 10 S.W.3d at 511 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). A movant must also show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* Counsel's actions are presumed competent. *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. 1997), *cert. denied*, 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998) (citing *Strickland*, 466 U.S. at 689–90, 104 S.Ct. 2052). Further, counsel's actions that constitute reasonable trial strategy are not grounds for ineffective assistance claims. *Id.*

## III.

Appellant contends that the motion court clearly erred in denying his claim that he received ineffective assistance of counsel when his trial counsel failed to present evidence that three Fulton State Hospital doctors who treated appellant, Drs. Holcomb, Harry, and Altomari, found that appellant was incapable of deliberating. Appellant also claims that his counsel were ineffective in failing to ensure that appellant's treating physicians, Drs. Holcomb and Harry, had access to neuropsychological tests, such as those performed by another doctor, Dr. Cowan. Appellant asserts that there is a reasonable probability that, had evidence of inability to deliberate been presented and had his treating physicians had access to neuropsychological tests of him, the jury would have found appellant guilty of some lesser degree of homicide or would have at least imposed a sentence of life imprisonment without parole.

Appellant first claims that he was prejudiced by his counsels' ineffective assistance in failing to present evidence that Drs. Holcomb, Harry, and Altomari believed that appellant was unable to deliberate because he could not coolly reflect.

The record supports the motion court's findings that counsel were not ineffective. Appellant's counsel had legitimate strategic reasons for failing to present evidence that Drs. Holcomb, Harry, Altomari believed that appellant was incapable of deliberating at the time of the murders. Appellant's counsel wanted a private mental health expert, rather than state doctors, to evaluate appellant. Appellant's counsel actively opposed the state's request that appellant be evaluated by state doctors. Appellant's counsel, Teoffice Cooper, testified that appellant's counsel had a number of reasons for seeking a private mental health expert to evaluate appellant, including the fact that an unfavorable evaluation by a private expert would not have to be disclosed to the state. After blocking the state's request for an evaluation of appellant, appellant's counsel hired a private mental health expert, Dr. Phillip Johnson,

to evaluate appellant. Johnson conducted a comprehensive forensic evaluation of appellant, which included spending over twenty hours with appellant, talking with appellant's family members, and reviewing information generated earlier in the case. Johnson produced two reports, one of which dealt primarily with appellant's competency to stand trial and one of which dealt primarily with appellant's culpability at the time of the crimes. Appellant's counsel took reasonable steps to evaluate appellant's mental health status and, in fact, fought to ensure that appellant would receive a favorable mental health evaluation.

The record also defeats appellant's claim of prejudice. Overwhelming evidence supported the jury's findings of deliberation in this case. Appellant told at least four people prior to the murders that he was planning to commit murder. Appellant went to the home where Bridgette was staying, armed with a shotgun and duffel bag containing clothing and ammunition, and carried out the murders, then had his brother follow him to the Carters' house, where he admitted to Gail Carter what he had done. Appellant then had his brother drive him to Trail of Tears State Park with his duffel bag. During the trip, appellant admitted the shootings to his brother. After being captured at Trail of Tears State Park, appellant confessed to the police. Appellant's employer, Greg Choate, testified at trial that appellant was a responsible worker and "one of his best employees." Choate testified that he last saw appellant on the Thursday prior to the killings and that appellant seemed "fine" and the "same old Andy." According to Choate, nothing indicated that appellant was out of touch with reality or that he did not know what he was doing. Appellant has presented no evidence that the testimony of Drs. Holcomb, Harry, and Altomari would have made a difference to the jury.

Appellant relies on *Antwine v. Delo*, 54 F.3d 1357 (8th Cir.1995), *cert. denied*, 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996), and *Dumas v. State*, 111 Nev. 1270, 903 P.2d 816 (1995). The cases are distinguishable. In *Antwine*, defense counsel relied solely upon one twenty minute evaluation of the defendant performed by a state psychiatrist who reviewed only a police background sheet even though state law entitled the defendant to a second, independent mental evaluation. *Antwine*, 54 F.3d at 1365. In *Dumas*, defense counsel "made no independent inquiry concerning [defendant's] mental condition" even though the state's expert had determined that the defendant was incapable of premeditated murder. *Dumas*, 903 P.2d at 817. In this case, appellant's counsel did make an independent inquiry into appellant's mental condition and hired a private expert who conducted an extensive mental evaluation of appellant. Appellant's counsel acted reasonably in seeking to exclude evidence that Drs. Holcomb, Harry, and Altomari believed that appellant was incapable of deliberating. Counsel reasonably believed that this evidence was not credible and may have been offensive to the jury. Counsel further acted reasonably in hiring a private mental health expert to evaluate appellant. Appellant's reliance on *Antwine* and *Dumas* is, therefore, misplaced.

■ As part of this point, appellant also claims that reasonably competent counsel would have ensured that Drs. Harry and Holcomb had access to neuropsychological testing, such as another doctor, Dr. Cowan, performed, in making their determinations about appellant's ability to have deliberated. Appellant contends that reasonably competent counsel would have sought neuropsychological testing because "Drs. Harry's and Stacy's initial evaluation and finding of incompetency had identified neuropsychological brain damage problems ."

Contrary to appellant's claims, reasonably competent attorneys who obtained Drs. Harry's and Stacy's initial report would not have ensured that Drs. Harry

and Holcomb had access to neuropsychological tests, such as those performed by another doctor, Dr. Cowan. Drs. Harry's and Stacy's initial report did not result in a diagnosis of brain damage. Drs. Harry's and Stacy's initial report concluded that appellant possessed "features ... consistent with [appellant's] severe depression substantially interfering with his cognitive functioning." Drs. Harry and Stacy found that appellant had various cognitive deficits, "despite [appellant] having **no evidence of brain damage**." (Emphasis added). A review of Drs. Harry's and Stacy's initial report would likely have led reasonably competent attorneys to conclude that further neuropsychological testing would reveal no additional, beneficial information. Further, it was reasonable for appellant's counsel to rely on their expert, Dr. Johnson, who reviewed the reports generated by the Fulton State Hospital doctors, including Drs. Harry's and Stacy's initial report, in determining what types of additional testing of appellant's mental status should be performed. Counsels' strategic decision to employ a private mental health expert to evaluate appellant and testify at trial was reasonable. There is no indication that appellant's counsels' failure to provide his treating doctors with access to neuropsychological testing was unreasonable or that appellant was prejudiced by his counsels' actions. The motion court's findings and conclusions are not clearly erroneous.

### IV.

■ Appellant's next point on appeal is that his counsel were ineffective in failing more exhaustively to question Lily Foster and Mary Lyons Carter; in failing to call Rose DePree, Mary Lyons, and Eugene Lester; and in failing to call psychologist Alice Vlietstra.

Appellant first claims that his counsel should have more exhaustively questioned his sister, Lily Foster. Appellant claims that Foster could have testified about ap-pellant's abusive childhood and the family's poverty.

Appellant has not demonstrated that the motion court clearly erred in determining that his counsel were not ineffective in failing more exhaustively to question Foster. Appellant's counsel made a reasonable strategic decision in their handling of Foster's testimony. Beth Davis–Kerry, one of appellant's counsel, testified that counsels' trial strategy was to present the mitigation evidence to the jury through a private mental health expert, Dr. Phillip Johnson. Foster herself suffered from depression, and Davis–Kerry testified that she worried about Foster's mental and emotional stability. Trial counsel were not ineffective.

Further, appellant has failed to prove that he was prejudiced by his counsels' failure to more exhaustively question Foster. Foster was called as a witness for the defense, both during the guilt phase and the penalty phase. During the penalty phase she did testify about appellant's childhood, his constant crying as a baby, his abuse from other children, his history of depression, and the break-up of his earlier marriage and the resulting loss of contact with the children born of that relationship. Appellant's claim of prejudice is simply not supported by the record.

■ Appellant next claims his counsel were ineffective in failing to more exhaustively question his sister, Mary Lyons Carter. Carter could have testified about appellant's abusive childhood and the family's poverty. She also could have testified that she warned Evelyn Sparks three weeks before the shootings not to intrude in appellant's and Bridgette's lives because "he's [appellant's] not wrapped too tight," which she would have testified meant that appellant "didn't have all his faculties up there. I meant he was kind of mental."

Counsels' strategic choice to question Carter in the way they did was reasonable. The record reflects that counsel interviewed Carter three times prior to trial.

Carter was called as a defense witness at trial. The record reflects that Carter testified about a number of subjects, including her warm relationship with appellant, appellant's childhood, and the events preceding the murders. Appellant has not demonstrated that he was prejudiced by his counsels' failure to more exhaustively question Carter. In addition, the information appellant claims Carter could have provided about his childhood would have been cumulative because this information was presented to the jury through the testimony of Dr. Phillip Johnson, Lily Foster, David Lyons, and Jerry DePree.

■ Appellant next contends that his counsel were ineffective in failing to investigate, call, and present evidence from his sister, Rose DePree. Appellant claims that DePree could have testified about appellant's abusive childhood and the family's poverty.

■ "The selection of witnesses and the decision not to call additional witnesses are matters of trial strategy.... Strategic choices made after thorough investigation are virtually unchallengeable." *State v. Davis*, 965 S.W.2d 927, 931 (Mo.App.1998). There is no showing that counsel did not investigate. Counsel interviewed DePree at the courthouse and, then, decided not to call her. The same sort of information about which DePree would have testified was presented to the jury through the testimony of Dr. Phillip Johnson, Lily Foster, Mary Lyons Carter, David Lyons, and Jerry DePree. Trial counsel were not ineffective in failing to call DePree as a cumulative witness.

■ Appellant next asserts that his trial counsel were ineffective in failing to investigate, call, and present evidence from his mother, Mary Lyons. Lyons could have testified that appellant broke out in welts at school when frightened; that she paid special attention to appellant because he was the only one of her children who acted as though he suffered from mental illness; that appellant took care of his son,

Dontay, on Saturday nights while Bridgette Harris stayed out until the next morning; that Bridgette told appellant that Dontay had an ear infection every Saturday; that Lyons told appellant that it was impossible for his son to have an ear infection every Saturday; that appellant continued to care for the children after he and Bridgette ended their relationship, and that Bridgette's son, Demetrius, asked when appellant would be allowed to come home from jail because he loves appellant and wants appellant to raise him and his sister, Deonandrea.

The motion court did not clearly err in determining that counsels' strategic decision not to call Lyons was reasonable. Lyons was deposed prior to trial, and Lyons's deposition testimony is the only evidence appellant now offers with regard to what Lyons would have testified. Appellant cannot claim that his counsel did not adequately investigate Lyons's testimony when he has presented no evidence beyond that gathered by his counsel in Lyons's deposition. Further, appellant has not demonstrated that he was prejudiced by his counsels' failure to call Lyons. The same sort of information about appellant's childhood years was presented to the jury through the testimony of Dr. Phillip Johnson, Lily Foster, David Lyons, Mary Lyons Carter, and Jerry DePree.

■ Appellant next asserts that his counsel were ineffective in failing to investigate, call, and present evidence from his brother, Eugene Lester. Lester could have testified that one of his mother's boyfriends would whip appellant when he could not sleep at night; that, when Lester was injured, appellant visited him every morning even though appellant had worked all night; that Bridgette Harris mocked appellant by telling him that another man, Mike Moore, made better love to her than appellant did; that Harris merely laughed when Lester told her to stop mocking appellant; and that Lester also remembered his sister, Alice DePree, warning Bridgette not to mock appellant.

Lester also could have testified about the events of the weekend of the murders.

The motion court did not clearly err in determining that counsels' decision not to call Lester was reasonable trial strategy. Counsel did not fail to investigate Lester. The record reflects that Lester was interviewed at least once before trial. Further, appellant has failed to demonstrate that he was prejudiced by his counsels' failure to call Lester. The information that Lester could have provided was presented to the jury through the testimony of Dr. Phillip Johnson, Lily Foster, Mary Lyons Carter, David Lyons, and Jerry DePree.

■ Finally, appellant contends that his counsel were ineffective in failing to call psychologist Dr. Alice Vlietstra to testify about appellant's childhood family and environmental experiences. Appellant claims that his "social history" could have affected his ability to deliberate and that the jury might have been persuaded not to give him the death penalty had they heard Dr. Vlietstra's proposed testimony.

The motion court did not clearly err in determining that counsel exercised reasonable trial strategy in failing to call Dr. Vlietstra. Counsel adopted a reasonable trial strategy of hiring psychologist Dr. Phillip Johnson to evaluate appellant, prepare reports, and testify about his findings. Further, appellant has not demonstrated that he was prejudiced by his counsels' failure to call Dr. Vlietstra. Dr. Vlietstra's proposed testimony is exactly the sort of testimony to which appellant's counsel, Teoffice Cooper, referred when he testified that this sort of testimony would have offended the jury during the guilt phase of the trial. The overwhelming evidence of deliberation in this case makes her testimony, at least as to the guilt phase, look ridiculous and insulting to the intelligence of the jury. As to the penalty phase, the "social history" aspect of Dr. Vlietstra's testimony was thoroughly presented by Dr. Johnson during the penalty phase. Dr. Johnson discussed in detail appellant's "social history," including his

impoverished background, the absence of his biological father, the poor health of his mother, the mental depression of his mother, his poor education, teasing from other students, his compulsive cleanliness, the break-up of his first marital relationship, his history of depression, his suicide attempts, and his lack of criminal history. Dr. Vlietstra's testimony added nothing of substance to Dr. Johnson's testimony. In fact, her testimony as a child development expert might well have been harmful to appellant because Dr. Vlietstra had to admit that Dontay had been old enough to feel fear and fright right before the shooting. Appellant might have been convicted of more than manslaughter on that count had Dr. Vlietstra's testimony been offered. Appellant has failed to show that his counsel were ineffective for failing to offer Dr. Vlietstra's cumulative testimony during the penalty phase or that the failure to call Dr. Vlietstra made any difference whatsoever in the outcome of the trial.

Appellant's reliance upon *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), for his argument that counsel were ineffective is misplaced. In *Williams,* counsel was found ineffective for failing to discover and present additional mitigating evidence even though counsel presented mitigating evidence through the defendant's mother, his friends, and a psychiatrist. *Id.* at 1514. Specifically, the attorneys in *Williams* failed to uncover evidence of the defendant's nightmarish childhood, evidence that the defendant's parents had been imprisoned for criminal neglect of the defendant and his siblings, evidence that the defendant had been severely and repeatedly beaten by his father, evidence that the defendant had been committed to the custody of social services for two years, evidence that the defendant had been placed in an abusive foster home, evidence that the defendant was borderline mentally retarded and did not advance beyond the sixth grade, and evidence that the defendant had aided the police in breaking up a prison drug ring. *Id.* The

attorneys in *Williams* also failed to prepare for the penalty phase until a week before trial and did not return a telephone call from a favorable witness offering to testify on appellant's behalf. *Id.*

The present case stands in stark contrast to *Williams*. Appellant's counsel extensively interviewed appellant's family members, visiting several of them on more than one occasion and contacting them by phone. There is no evidence here of the general lack of preparedness evident in *Williams*. Counsel called several of appellant's family members to testify during the penalty phase, and these witnesses outlined virtually all of the relevant mitigating aspects of appellant's childhood that appellant now claims were omitted. Appellant correctly notes that his family members did not provide any significant history of appellant's abuse by his stepfather, Sola DePree. Appellant's counsel cannot be deemed ineffective for failing to discover evidence of abuse that appellant's family did not share with them during the investigation. None of appellant's family members testified about appellant being abused by his stepfather, and no document produced prior to trial mentioned any history of appellant being abused by his stepfather. In fact, after extensively evaluating appellant, Dr. Johnson concluded that appellant had no history of abuse and that appellant had only reported being whipped with a garden hose on one occasion. Dr. Johnson also testified during the penalty phase, detailing appellant's social history, offering his opinion of appellant's mental condition, and testifying that appellant's depression was a major contributor to appellant's actions on the day of the murders. Appellant has asserted no error on the part of counsel in selecting Dr. Johnson as an expert. Counsel is not required to shop for an expert witness who might provide more favorable testimony. *State v. Kenley*, 952 S.W.2d 250, 268–69 (Mo. banc 1997), *cert. denied*, 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998). While counsel might have reasonably sought another psychologist, such as Dr. Vlietstra, they were not ineffective for failing to do so.

## V.

Appellant claims his counsel were ineffective in failing to move for a mistrial or in failing to request that the entire fourth panel of venirepersons be discharged when venireperson Milam requested that he be discharged from serving because he had read newspaper articles about appellant's case and believed appellant was "guilty as sin." Appellant claims that he was prejudiced by his counsels' ineffective assistance in that one venireperson who served as a juror and deliberated, Mr. Seiler, was on the fourth panel of venirepersons and heard venireperson Milam's comment.[1]

Appellant has failed to establish that the motion court clearly erred in determining that his counsel behaved reasonably in failing to move for a mistrial and in failing to request that the fourth panel be discharged when venireperson Milam stated that he believed appellant was "guilty as sin." When he deposed his trial counsel, appellant failed to ask his counsel why they chose not to request a mistrial or request that the fourth panel be discharged after venireperson Milam's comment. Having failed to make such an inquiry of his counsel, appellant has failed to produce any evidence that his counsels' actions fell below an objective standard of reasonableness. Appellant has failed, therefore, to overcome the presumption that his counsels' performance was competent. For any number of sound strategic reasons, counsel may have declined to move for a mistrial or to have the panel discharged. For example, counsel may have reasonably believed that venireperson Milam's comment had little or no im-

---

1. Appellant initially claimed that another juror, Mr. Evans, also heard venireperson Milam's comment. Appellant abandoned this claim in his reply brief, acknowledging that Mr. Evans was not on the fourth panel.

pact on the other members of the panel, or counsel may reasonably have believed that it was desirable to retain the fourth panel because that panel contained other potential jurors who would benefit appellant. Absent evidence from appellant, this Court cannot conclude that the motion court clearly erred in determining that his counsels' actions in light of venireperson Milam's comment were reasonable.

Appellant cites *State v. Evans*, 802 S.W.2d 507 (Mo. banc 1991), and claims that it would have been an abuse of discretion for the trial court to have refused to strike the panel or declare a mistrial in light of venireperson Milam's comment if appellant's counsel had requested such relief. *Evans* is of no assistance to appellant. In *Evans*, a venireperson remarked that "[e]verybody's got some kind of thoughts, what he did to this nine year old girl." *Id.* at 514. This Court held that it was unnecessary to strike the panel because the venireperson who made the comment had been stricken, and the panel had been instructed to disregard the venireperson's comment. *Id.* at 515. Here, as in *Evans*, only one comment is at issue, and the venireperson who made the comment was stricken. Further, in this case, unlike in *Evans*, the comment in question made no reference to details of the crimes charged. Appellant has failed to establish that his counsel did anything other than make a reasonable strategic choice.

Appellant has likewise failed to establish that he was prejudiced by his counsels' actions. After venireperson Milam's comment, appellant's counsel specifically questioned Mr. Seiler about whether he had heard anything about the case that had caused him to decide the case already. Mr. Seiler responded: "No, I haven't heard anything." Mr. Seiler affirmed that he understood that the state was required to prove every element of its case against appellant. Mr. Seiler stated that he could follow the law and agreed that appellant was innocent until proven guilty. Mr. Seiler also stated that he could identify noth-

ing that would keep him from being a fair and impartial juror. Appellant has not met his burden of establishing that the motion court clearly erred in determining that appellant was not prejudiced by his counsels' actions.

■ This is not a case, as appellant claims, where prejudice should be presumed. Prejudice is not presumed simply because a defendant claims that jurors were tainted by remarks made by fellow venirepersons. *See Moss*, 10 S.W.3d at 513–14. *Presley v. State*, 750 S.W.2d 602 (Mo.App.1988), *cert. denied*, 488 U.S. 975, 109 S.Ct. 514, 102 L.Ed.2d 549 (1988), upon which appellant relies, is distinguishable. In *Presley*, counsel failed to move to strike a venireperson who stated during voir dire that she could not be fair and impartial. *Presley*, 750 S.W.2d at 604–08. The court held that it would presume prejudice because the allegedly biased venireperson had served as a juror in violation of the defendant's right to a fair and impartial jury at trial. *Id.* at 607. In this case, venireperson Milam was stricken from the jury. Appellant has failed to establish prejudice.

## VI.

■ Appellant claims that the motion court clearly erred in adopting the prosecutor's proposed findings of fact and conclusions of law.

The evidentiary hearing on the postconviction relief motions was held on August 12, 1999. At the conclusion of the evidentiary hearing, the motion court requested proposed findings and conclusions from both parties. Subsequently, the state submitted its proposed findings and conclusions and appellant submitted a brief. Approximately three months later, the motion court adopted the findings and conclusions proposed by the state and issued its judgment.

In *Skillicorn v. State*, 22 S.W.3d 678, 690–91 (Mo. banc), *cert. denied*, —— U.S. ——, 121 S.Ct. 630, 148 L.Ed.2d 538

(2000), this Court held, when addressing a virtually identical claim to that made by appellant in this case, that no constitutional problem arises from adoption of proposed findings and conclusions so long as, after independent reflection, the court concurs with the contents of the proposed findings and conclusions and the proposed findings of fact and conclusions of law are supported by the evidence. *Id.* at 690–91.

Nothing in this case offends the requirements of *Skillicorn.* The motion court in this case had several months in which to review the evidence in this case. There is simply no reason to believe that the court did not do so. The evidence, furthermore, clearly supports the findings of fact and conclusions of law made by the motion court.

Appellant points to a statement by the motion court at the time the court requested proposed findings and conclusions that the court would prepare a "separate set" of findings and conclusions. The motion court's statement read in context of the requirements of the law as set forth in *Skillicorn* is not relevant and does not suggest that the motion court's later adoption of the state's proposed findings and conclusions lacked independent reflection.

To conclude, because the motion court issued valid findings and conclusions supported by the evidence, the motion court did not clearly err merely because it adopted the findings and conclusions drafted by the state.

## VII.

Appellant contends that the motion court clearly erred in denying his claim that counsel were ineffective in failing to more exhaustively challenge the penalty phase instructions. Appellant's counsel filed a pre-trial motion that alleged, among other things, that the penalty phase instructions were "misleading to the jury," and counsel proffered alternative instructions. Appellant claims that counsel in addition should have presented evidence of Dr. Richard Wiener's study

that purports to show that Missouri's penalty phase instructions are not well understood by jurors.

Counsel in this case acted reasonably, and appellant was not prejudiced. A claim similar to the one presented here was considered in *State v. Deck,* 994 S.W.2d 527, 542–43 (Mo. banc), *cert. denied,* 528 U.S. 1009, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999). In *Deck,* the defendant argued that the penalty phase instructions and the mitigating circumstances instructions in particular were "too easily misunderstood." *Id.* at 542. At the hearing on a motion for new trial, the defendant called Dr. Wiener, who explained that his conclusion was based upon his study that showed that jurors have the most difficulty with the concept of mitigation. *Id.* This Court determined that Wiener's study was flawed in part because the people interviewed for the study did not act as jurors. They were given hypothetical facts that were different from the facts in *Deck,* and they did not hear the testimony of witnesses, observe the evidence, or deliberate with eleven other jurors. More particularly, read in the context of the instructions as a whole, the term "mitigating," said this Court in *Deck,* is always contrasted with the term "aggravating" so that no reasonable person could fail to understand the meaning of the term. *Id.* at 542–43.

As in *Deck,* the jurors in the present case did not participate in Wiener's study. The jurors in the study were not placed in a trial setting that matched appellant's case, and, most significantly, there is no reason whatsoever to believe that any of appellant's jurors misunderstood the instructions; the language of the instructions is plainly understandable.

Similarly, in *State v. Jones,* 979 S.W.2d 171, 181 (Mo. banc 1998), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999), the defendant claimed that counsel was ineffective for "failing to challenge the MAI instructions through presenting evidence that jurors do not understand the

instructions." *Id.* In *Jones*, the defendant asserted that Dr. Wiener could have testified about his study that purports to demonstrate that jurors do not understand the instructions. *Id.* This Court responded that Dr. Wiener's research does not necessarily support a conclusion that the jurors in *Jones* were unable to understand the MAI instructions. Furthermore, the MAI instructions are constitutional. Counsels' failure to object to possible jury misunderstanding in *Jones* did not support claims of ineffective assistance of counsel. *Id.* This case is not distinguishable from *Jones.*

Finally, the record itself undercuts appellant's claim that the jury would have been confused by the MAI instructions. The jury considered evidence with regard to the appropriate punishment for the murder of Bridgette Harris, considering evidence in aggravation and mitigation. The jury concluded that the murder of Bridgette Harris warranted imposition of the death penalty. *Lyons*, 951 S.W.2d at 588. In the same case, in assessing the appropriate punishment for the murder of Evelyn Sparks, the jury was not able to reach a conclusion. *Id.* These facts support a finding that the jury understood the instructions.

Appellant's counsel adequately challenged the penalty phase instructions. There is no reason to believe that appellant's jurors were confused by the plain language of the instructions, which have been determined to be constitutional. There was no prejudice from counsels' failure to call Dr. Wiener to testify. The motion court did not clearly err in denying this claim.

## VIII.

 Appellant contends that trial counsel were ineffective for failing to more exhaustively challenge this Court's method of proportionality review. He argues that this Court fails to engage in meaningful proportionality review because it fails to consider all similar cases and does not maintain a complete database of cases, re-

sulting in an arbitrary imposition of the death penalty. Movant contends that his trial attorneys rendered him ineffective assistance of counsel because they failed to offer studies to accompany their motion claiming that death penalty proportionality review procedure by this Court is unconstitutional.

Section 565.035.3(3), RSMo 1994, specifically requires this Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." The term "similar cases," as interpreted by this Court, means other cases where death has been imposed. *See State v. Clay*, 975 S.W.2d 121, 146 (Mo. banc 1998), *cert. denied*, 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999); *State v. Rousan*, 961 S.W.2d 831, 854–55 (Mo. banc), *cert. denied*, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). That method of comparing similar cases is proper and does not violate due process. *See McCleskey v. Kemp*, 481 U.S. 279, 306–07, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). *See also Walton v. Arizona*, 497 U.S. 639, 655–56, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). This Court's method of proportionality review has been held not to violate due process. *See Tokar v. Bowersox*, 198 F.3d 1039, 1052 (8th Cir.1999); *Ramsey v. Bowersox*, 149 F.3d 749, 754 (8th Cir.1998); *Murray v. Delo*, 34 F.3d 1367, 1376–77 (8th Cir.1994), *cert. denied*, 515 U.S. 1136, 115 S.Ct. 2567, 132 L.Ed.2d 819 (1995).

This Court has repeatedly denied similar claims of defects in our method of proportionality review. *See State v. Smith*, 32 S.W.3d 532, 559 (Mo. banc 2000); *State v. Johnson*, 22 S.W.3d 183, 193 (Mo. banc), *cert. denied*, —— U.S. ——, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000); *State v. Winfield*, 5 S.W.3d 505, 516–17 (Mo. banc 1999), *cert. denied*, 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000); *State v. Middleton*, 998 S.W.2d 520, 530 (Mo. banc 1999), *cert. denied*, 528 U.S. 1167, 120 S.Ct. 1189, 145 L.Ed.2d 1094 (2000); *State v. Barnett*, 980

S.W.2d 297, 309 (Mo. banc 1998), *cert. denied,* 525 U.S. 1161, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999); *State v. Johnson,* 968 S.W.2d 123, 134–35 (Mo. banc), *cert. denied,* 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998).

The motion court did not clearly err.

The judgment is affirmed.

All Concur.