# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2907

_____

| | | |
|---|---|---|
| John Middleton, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Don Roper, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: June 14, 2007
Filed: August 17, 2007

_____

Before LOKEN, Chief Judge, ARNOLD and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

John Middleton was convicted of the first-degree murder of Alfred Pinegar and sentenced to death by a Missouri trial court. The Supreme Court of Missouri affirmed the conviction and sentence on direct appeal, *State v. Middleton*, 995 S.W.2d 443 (Mo. 1999) ("*Middleton I*"), and subsequently affirmed the denial of his motion for post-conviction relief. *Middleton v. State*, 103 S.W.3d 726 (Mo. 2003) (*Middleton II*). Middleton applied for a writ of habeas corpus in federal court under 28 U.S.C. § 2254.

The district court[1] denied relief on all thirty-two grounds claimed, but granted a certification of appealability on four issues. We affirm.

I.

We recite the facts as set forth by the Supreme Court of Missouri in its opinion affirming the denial of post-conviction relief. *See* 28 U.S.C. § 2254(e). On June 10, 1995, police arrested several individuals in Harrison County, Missouri, on methamphetamine-related charges. John Middleton, a local methamphetamine user and dealer, was not arrested at that time. About ten days later, he told a friend that "the snitches around here are going to start going down." He said he had a "hit list," which included Alfred Pinegar, another methamphetamine dealer and an associate of Middleton's. Two days after making these comments, Middleton told the same friend that he was "on his way to Ridgeway, Missouri, to take Alfred Pinegar fishing."

Pinegar lived with his fiancée, Priscilla Hobbs, in Davis City, Iowa, just north of Harrison County. On June 23, 1995, Hobbs passed Middleton on the road on her way to Davis City. Middleton and his girlfriend were in a white Chevrolet pickup truck. When Hobbs arrived at home, Pinegar was gone, and the yard had been only partly mowed. Also missing were about $200 and a twelve-gauge shotgun that Pinegar habitually carried.

Around noon of that day, Middleton entered a Wal-Mart in Bethany, Missouri, with his girlfriend, Maggie Hodges, and a man believed to be Pinegar. They approached the sporting goods department where Middleton purchased six boxes of nine-millimeter ammunition and two boxes of twelve-gauge buckshot.

---

[1] The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

After leaving Wal-Mart, the three drove several miles to the vicinity of Ridgeway, where they parked in a field. When Middleton brandished Pinegar's shotgun, Pinegar fled. Middleton shot him twice in the back and then killed him with a shot to the face. Middleton dumped Pinegar's body over a fence.

Middleton and Hodges then returned to the Bethany Wal-Mart, where Middleton exchanged the nine-millimeter rounds for ammunition of another caliber. Later in the afternoon, Gerald Parkhurst saw Middleton and Hodges standing beside their pickup on a road near Bethany. Explaining that the truck had broken down, Middleton and Hodges asked for a ride. Parkhurst agreed. The couple took five or six guns, including the shotgun, out of the pickup truck and placed them in Parkhurst's car. Parkhurst drove them to Spickard, Missouri, where they took the guns and left.

On June 25, 1995, John Thomas visited Middleton to discuss possible drug informants. Middleton said that "something had to be done about them." He told Thomas that he had Pinegar's shotgun and that Pinegar "wouldn't be needing it no more." The following day, Pinegar's body was discovered. Police also found at the crime scene a piece of leather fringe, an empty box of twelve-gauge shells, a pair of sunglasses with a missing lens, and a small plastic clock.

Several months later, while in jail, Middleton admitted to a fellow inmate that he killed Pinegar out of fear that Pinegar would "snitch" on him. Middleton described the murder to the other inmate, and said he was worried that he may have left some fringe from his leather jacket at the scene.

Middleton was tried and convicted of the first-degree murder of Pinegar. He presented no evidence in his defense in the guilt phase of the trial. In the punishment phase, the State presented evidence that he had subsequently murdered one Randy Hamilton and his girlfriend, Stacey Hodge, as part of his effort to eliminate informants. The jury recommended a death sentence, and the circuit court imposed

it.  Later, in a separate trial, Middleton was also sentenced to death for the other two murders.  *See Middleton v. Roper*, 455 F.3d 838 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 980 (2007).

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal court may grant a writ of habeas corpus only if the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"A decision is 'contrary to' federal law . . . if a state court has arrived 'at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or if it 'confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent' but arrived at an opposite result."  *Davis v. Norris*, 423 F.3d 868, 874 (8th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  "A state court unreasonably applies clearly established federal law when it 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  *Id.* (quoting *Williams*, 529 U.S. at 413).  The factual findings of the state courts are presumed correct, and the applicant has the burden to rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A.

Middleton first claims that he was denied his right to effective assistance of counsel and to due process of law when the state trial court refused to grant his requests for a continuance of the trial. Middleton complains that the State endorsed twenty-three new witnesses only three weeks prior to trial, and that as a result, his counsel were unable adequately to prepare his defense. He contends that counsel were forced to conduct depositions in the evening during the trial instead of readying themselves for the following day's cross examinations, and that their effectiveness at trial suffered as a consequence.

By the time Middleton went to trial, about a year and four months had elapsed since an information was filed against him. His first counsel entered her appearance the day after the information was filed. In June 1996, eight months after the information was filed, his counsel requested and received a continuance from October 7, 1996, to February 24, 1997. Two more attorneys joined Middleton's team in the summer or early fall of 1996. Middleton moved for a continuance several times during the final three weeks before trial, but the trial court adhered to the scheduled trial date in February 1997.

Middleton's first request for a continuance, made three weeks before the February trial date, argued that counsel were unable to complete their preparation due to the unexpected length of depositions, the need to defend against accusations of two additional murders in the penalty phase, the recent discovery of additional reports and evidence, and the fact that some of the witnesses were difficult to locate. The trial court denied the motion, saying that "this is the kind of case that never would be ready for trial," because "there are always other witnesses to find or discovery or some new facet that comes up or something." (T. Tr. 615). The court also reasoned that it was required to recognize the speedy trial rights of the defendant, who had been in confinement for an extended period of time. After the State endorsed its new

-5-

witnesses, the trial court found that the defense would not be prejudiced by the endorsement and denied a second motion to continue, but granted Middleton leave to object to the presentation of the witnesses if unforeseen discovery problems arose. In a third motion to continue that was filed five days before trial, Middleton's lawyers argued that they were still not prepared to go to trial, citing a potential conflict of interest over the representation of a prosecution witness, the asserted unavailability of their own recently-endorsed penalty phase expert witness, continuing efforts to obtain discovery materials and other information from the State, and the need to have certain fiber evidence analyzed. The court denied the motion saying that "even if we continued it for six months, right before trial there are always those crises and problems and things that arise, and no matter how you went, six months or a year, you would have problems of that kind and that nature." (T. Tr. 758). The court concluded that "the case is in the stage that it can be tried with fairness to Mr. Middleton," but pledged to consider "additional protections" if Middleton raised "particular instances where relief is required from the Court" to ensure a fair trial. (*Id.*).

At trial, the State eventually called eleven of the twenty-three late-endorsed witnesses to testify. Middleton did not renew an objection to several of these witnesses, and others testified only briefly regarding perfunctory matters, such as the chain of custody of physical evidence. The court eventually granted Middleton's motion to exclude the testimony of the witness with the asserted conflict of interest. The court denied objections to the testimony of the remaining late-endorsed witnesses.

On direct appeal, the Supreme Court of Missouri held that the trial court did not abuse its discretion by denying the motions to continue. The court observed that many of the twenty-three witnesses endorsed shortly before trial were "chain-of-custody" witnesses who verified the proper handling of physical evidence, that others already had been deposed by the defense or had testified in pre-trial proceedings, and that still others had been endorsed previously by the prosecution or the defense, or at least had been identified in police reports. The court distinguished its precedents in

which the State failed to disclose key evidence until the morning of trial, and determined that in this case, Middleton had not established that he was prejudiced by the denial of his requests for a continuance.

Middleton argues that the trial court's decisions resulted in a violation of his rights under the Sixth and Fourteenth Amendments, and that the state supreme court unreasonably applied clearly established law in denying relief. Two Supreme Court precedents principally govern an accused's constitutional right to a continuance. In *Ungar v. Sarafite*, 376 U.S. 575 (1964), a case involving a criminal contempt proceeding against a witness in a criminal trial, the Court opined that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process," indicating that "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* at 589. The Court explained that not every denial of a request for more time violates due process, even if the consequence of the ruling is that a party fails to offer evidence or is compelled to defend without counsel. On the other hand, the Court allowed that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id.* In *Ungar*, the Court held that the trial court's denial of a motion for continuance on the day of the scheduled contempt hearing did not deprive the defendant of due process, even though counsel said that he was contacted only three days earlier and was unfamiliar with the case. *Id.* at 590.

Subsequently, in *Morris v. Slappy*, 461 U.S. 1 (1983), the Court again emphasized that "[t]rial judges necessarily require a great deal of latitude in scheduling trials," and explained that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Id.* at 11. The governing standard for the Sixth Amendment, the Court declared, is that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for

delay' violates the right to the assistance of counsel." *Id.* at 11-12 (quoting *Ungar*, 376 U.S. at 589).

These decisions of the Supreme Court state the governing constitutional rule at a high level of generality. In applying the deferential standard of AEDPA, "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *see also Carey v. Musladin*, 127 S. Ct. 649, 654 (2006). Granting that leeway to the state supreme court, we agree with the district court that the resolution of Middleton's claim was not an unreasonable application of Supreme Court precedent.

The Supreme Court of Missouri reasonably could conclude that the decisions of the state trial court recounted above were not an "unreasoning and arbitrary" insistence on proceeding to trial in the face of a justifiable request for delay. *See Slappy*, 461 U.S. at 11. The trial court determined that Middleton could receive a fair trial without a continuance, and the state supreme court provided an expanded rationale for this conclusion, based on the nature of the witnesses who were endorsed by the prosecution three weeks before trial. As to six late-endorsed witnesses about whom the defense raised objections during trial, the prosecution argued either that the witnesses were perfunctory or that defense counsel already had information about the witnesses through previous hearings and police reports, and the trial court overruled the objections. The state supreme court accepted the State's contention, finding that the disputed witnesses were simply "chain of custody" witnesses, had already been deposed, had testified in pretrial proceedings, or had been identified in police reports. *Middleton II*, 995 S.W.2d at 465. Middleton has not rebutted that factual determination. *See* 28 U.S.C. § 2254(e)(1). Middleton now advances general arguments that his counsel were hampered in their ability to prepare by the late disclosure of witnesses for the prosecution, but he has identified no specific instance in which additional time for preparation would have improved the performance of counsel or the fairness of the trial. *See Wise v. Bowersox*, 136 F.3d 1197, 1207 (8th

-8-

Cir. 1998) (holding that "inadequate preparation in itself does not prejudice a defendant," and that a habeas applicant must show that counsel's poor preparation resulted in substandard and prejudicial performance). We agree with the district court that "counsel vigorously and competently" represented Middleton throughout the trial, and that the Supreme Court of Missouri reasonably concluded that the trial court's denial of a continuance did not deprive Middleton of a fair trial or effective assistance of counsel.

B.

Middleton's second claim is that the trial court, by reciting the Missouri Approved Jury Instructions at the penalty phase rather than a set of instructions requested by Middleton, precluded the jury from giving consideration to mitigating evidence, as required by the Eighth Amendment. The instructions employed by the trial court first asked the jury to determine whether any statutory aggravating factors had been proven beyond a reasonable doubt. (App. at 903). If so, then the jury was instructed to determine "whether there are facts and circumstances in aggravation of punishment which, taken as a whole, warrant the imposition of a sentence of death upon the defendant." (*Id*. at 904). Next, the jury was advised that if it found that the aggravating circumstances "warrant the imposition of a sentence of death," then it "must determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in aggravation of punishment." (*Id*. at 905). This instruction required the jury to consider two statutory mitigating factors, as well as "any other facts or circumstances which you find from the evidence in mitigation of punishment." (*Id*.).

Middleton contends that the jury was likely to misunderstand these instructions, and that his "simple, clear, and understandable" alternatives should have been given instead. He argues that the court's instructions were structured in a way that precluded the jury from giving effect to mitigating evidence. In addition to a general

argument of confusion, he asserts that the instruction on aggravating circumstances called upon the jury to make the "death decision in isolation, solely on the basis of aggravating circumstances," and that the jury was not told until the next instruction, "after they have already decided that death is the appropriate punishment," that they should consider mitigating circumstances.

On direct appeal, the Supreme Court of Missouri held that the trial court did not err by using the Missouri Approved Instructions rather than Middleton's proposed alternatives. The court concluded that the catch-all paragraph on mitigating circumstances was sufficient to permit the jury to give effect to any mitigating evidence. *Middleton I*, 995 S.W.2d at 464.

We have held previously, even without the deferential lens of AEDPA, that the Missouri Approved Instructions are consistent with the Eighth Amendment. In *Ramsey v. Bowersox*, 149 F.3d 749, 757 (8th Cir. 1998), we held that the approved instructions did not improperly limit the jury's consideration of mitigating evidence, and observed that the Supreme Court had approved a similar set of instructions in *Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998). In *Bolder v. Armontrout*, 921 F.2d 1359, 1367 (8th Cir. 1990), we rejected an argument that the order and phrasing of the instructions on aggravating and mitigating circumstances improperly shifted the burden of proof to the defendant to present mitigating evidence to avoid the death penalty.

Middleton's argument is phrased a bit differently, but we again perceive no constitutional flaw in the instructions, and thus no unreasonable application of established law. Viewing the instructions as a whole rather than in artificial isolation, *see Boyde v. California*, 494 U.S. 370, 378 (1990), we see no reasonable likelihood that the jury was precluded from considering mitigating evidence. Although the jury was asked first to determine whether aggravating circumstances existed and whether they were sufficient to warrant the death penalty, that was a permissible step to narrow

the class of defendants eligible for the death penalty. *See Lowenfield v. Phelps*, 484 U.S. 231, 244-46 (1988). The instructions were clear that the decision on aggravating circumstances did not constitute the ultimate selection of the appropriate punishment for this defendant. *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994). Rather, the jury was then required to consider mitigating evidence, and to impose a term of life imprisonment if the mitigating circumstances were sufficient to outweigh the aggravating circumstances. This is a permissible means of allowing the jury to give effect to mitigating evidence. *See Kansas v. Marsh*, 126 S. Ct. 2516, 2522-24 (2006). Another instruction, moreover, specifically explained that the jury was *not* compelled to fix death as the punishment, even if the mitigating circumstances *did not* outweigh the aggravating circumstances. (App. at 907). We conclude that the state supreme court did not unreasonably apply Supreme Court precedent in rejecting Middleton's Eighth Amendment claim.

In a related argument, Middleton contends that his trial counsel were ineffective because they failed to object to the pattern instructions and to present evidence of scientific studies by Dr. Richard Wiener, a psychologist. According to Dr. Wiener, his studies show that jurors do not understand the standard Missouri instructions, that it is possible to improve juror comprehension by rewriting the instructions, and that jurors who do not comprehend the instructions may be more likely to impose the death penalty.

The state post-conviction trial court found that Dr. Wiener's findings and conclusions were "not persuasive" and did not establish that the Missouri pattern instructions were confusing or misleading to the jury. Accordingly, the court ruled that trial counsel were not ineffective for declining to object to the pattern instructions or in failing to present Dr. Wiener's studies. The Supreme Court of Missouri summarily affirmed the trial court's ruling, citing several decisions in which it had rejected similar arguments based on Dr. Wiener's studies. *Middleton II*, 103 S.W.3d at 743 (citing *Lyons v. State*, 39 S.W.3d 32, 43-44 (Mo. 2001); *State v. Deck*, 994

-11-

S.W.2d 527, 542-43 (Mo. 1999); *State v. Jones*, 979 S.W.2d 171, 181 (Mo. 1998)). In *Deck*, for example, the state supreme court rejected Dr. Wiener's conclusion that jurors were unlikely to understand the concept of mitigation, reasoning that "the term 'mitigating' is always contrasted with the term 'aggravating' so that no reasonable person could fail to understand that 'mitigating' is the opposite of 'aggravating.'" 994 S.W.2d at 542-43. In *Lyons*, the court concluded that the language of the pattern instructions is "plainly understandable." 39 S.W.3d at 43.

We conclude that the Supreme Court of Missouri did not unreasonably apply *Strickland v. Washington*, 466 U.S. 668 (1984), in holding that trial counsel were not ineffective for failing to rely on the Wiener studies. We already have explained that the Missouri pattern instructions give the jury an adequate opportunity to give effect to mitigating evidence, and we agree with the state supreme court that when the instructions are viewed as a whole, they are understandable. Because reliance on the Wiener studies would have been unavailing, it was reasonable for the state court to hold that counsel reasonably declined to present the studies and that Middleton suffered no prejudice.

C.

Middleton's third contention is that the trial court's admission of a videotape and photograph showing the bodies of Middleton's murder victims in an uncharged case was so unfairly prejudicial that it violated his rights under the Due Process Clause. The disputed videotape shows the scene where the bodies of Stacey Hodge and Randy Hamilton were discovered in the trunk of a car. The district court found that the videotape was "admittedly gruesome, showing the two victims' skeletized remains found a month after they had been killed." *Middleton v. Roper*, No. 4:03CV543, 2005 WL 2298203, at * 35 (E.D. Mo. 2005).

On direct appeal, the Supreme Court of Missouri held the trial court did not abuse its discretion in admitting this evidence. *Middleton I*, 995 S.W.2d at 463. The court ruled that the character and history of the defendant, including prior crimes committed by the defendant, is admissible as relevant evidence in the penalty phase of a capital trial. The court reasoned that the sole account of how Hodge and Hamilton were murdered came from Stallsworth, the jailhouse informant, and that the videotape and photograph corroborated his testimony and helped the jury to understand Middleton's prior acts for the purpose of determining his punishment for Pinegar's murder. *Id.*

The only Supreme Court precedent on which Middleton relies is *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). In that case, the Court rejected a habeas petitioner's claim for relief based on allegedly improper remark by a prosecuting attorney, but established some general principles for application of the Due Process Clause. The Court explained that the "process of constitutional line drawing in this regard is necessarily imprecise," *id*. at 645, but emphasized that courts should observe the distinction between "ordinary trial error of a prosecutor" and "egregious misconduct" that amounts to a denial of constitutional due process. *Id*. at 647-48. The ultimate standard, as later applied to determine whether the admission of disputed evidence at a sentencing hearing violates the Due Process Clause, is whether the evidence "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). Under AEDPA's habeas review, we consider whether the state supreme court's rejection of Middleton's claim was an objectively unreasonable application of Supreme Court precedent concerning the Due Process Clause. Whether the evidence was properly admissible under Missouri law is "no part" of our review, because habeas review does not lie to correct alleged errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

-13-

The disputed videotape and photograph in this case were relevant to prove Middleton's other criminal acts. These acts, in turn, were relevant to the sentencing decision. *See Zant v. Stephens*, 462 U.S. 862, 888 (1983); *Wise v. Bowersox*, 136 F.3d at 1205-06. The photograph of Hodge's body was used by an expert witness in describing her fatal injuries and corroborated Stallsworth's testimony. The videotape of the bodies in the trunk corroborated Stallsworth's account of Middleton's admissions.

Middleton contends that the videotape, in particular, was cumulative of testimony from law enforcement officers, but the Supreme Court has never held that the admission of indisputably relevant evidence amounts to a denial of due process. Our own precedents, which have upheld the admission of similar evidence against due process challenges prior to AEDPA, provide support for the view that the state court's application of Supreme Court precedent was at least objectively reasonable. *See Clark v. Wood*, 823 F.2d 1241, 1246-47 (8th Cir. 1987) (holding no due process violation where trial court admitted "graphic and detailed pictures" of a victim in an uncharged murder, in addition to testimony of witnesses who described the scene "in detail," because photographs were relevant to show circumstances or background of the charged murder); *Kuntzelman v. Black*, 774 F.2d 291, 292 (8th Cir. 1985) (per curiam) (affirming denial of habeas relief where trial court admitted "particularly gruesome" photographs of a murder victim's body and body parts from an autopsy, because they were "arguably relevant and probative" in showing the identity and condition of the deceased, the location of the wound, and the defendant's intent); *Walle v. Sigler*, 456 F.2d 1153, 1155 (8th Cir. 1972) (holding no due process violation in trial court's admission of "gruesome" photographs of uncleansed corpse, saying "it must be noted that this condition is an inherent and inseparable part of the crime with which this defendant was charged"). The Supreme Court's guidance in this area is quite general, and we do not think the state supreme court unreasonably applied those precedents in holding that the trial court's evidentiary decisions did not amount to a denial of due process.

D.

Middleton's final claims concern the proportionality of his punishment. He contends that his sentence of death is not proportionate to the punishment imposed in similar Missouri cases, and that Missouri's system of proportionality review fails to provide an appropriate comparison among cases. The Supreme Court of Missouri rejected Middleton's challenges to proportionality review, citing this court's decision that "Missouri's proportionality review does not violate the Eighth Amendment, due process, or equal protection of the laws." *Middleton I*, 995 S.W.2d at 468 (quoting *Ramsey*, 149 F.3d at 754).

The Eighth Amendment does not require proportionality analysis, *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984), but we have said that once a State creates a right to proportionality review, as Missouri has done, *see* Mo. Rev. Stat. § 565.035, then the State may not arbitrarily deny that right to a particular defendant. *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994). In this case, the Supreme Court of Missouri performed the prescribed review, *see Middleton I*, 995 S.W.2d 467-68, and the Constitution does not call for us to look behind that review. *Walton v. Arizona*, 497 U.S. 639, 656 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 589 (2002); *Kilgore v. Bowersox*, 124 F.3d 985, 996 (8th Cir. 1997). Middleton contends that the state supreme court should be required to compare similar cases in which the death penalty was rejected or was not sought, and that it should engage in a statistical or scientific comparison of cases. But we may not consider whether the state court misinterpreted the relevant state statute, *McGuire*, 502 U.S. at 67-68; *Kilgore*, 124 F.3d at 996, and "a defendant cannot 'prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty.'" *United States v. Johnson*, No. 06-1001, 2007 WL 2163002, at *4 (8th Cir. July 30, 2007) (quoting *McClesky v. Kemp*, 481 U.S. 279, 306-07 (1987)); *see also Getsy v. Mitchell*, No. 03-3200, 2007 WL 2118956, at *7 (6th Cir. July 25, 2007) (en banc). Accordingly, we hold that the state supreme court's decision on

-15-

proportionality review did not unreasonably apply clearly established federal law as determined by the Supreme Court.

*　　*　　*

The judgment of the district court is affirmed.

_____