**SHOLOME FRANCIS, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2008-0041

Supreme Court of the Virgin Islands

February 28, 2012

372

373

374

JUDITH L. BOURNE, ESQ., The Bourne Law Office, PLLC St. Thomas, USVI, *Attorney for Appellant.*

Tiffany V. Monrose, Esq., V.I. Department of Justice St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(February 28, 2012)

CABRET, *Associate Justice.* Following a jury trial, Appellant Sholome Francis was found guilty of murder in the first degree and sentenced to life in prison without the possibility of parole. *People v. Francis*, No. ST-07-CR-287 (V.I. Super. Ct. Apr. 18, 2008). Francis challenges the conviction on four grounds: (1) the court should have given an independent intervening cause instruction to the jury, (2) the evidence of causation was insufficient to support a conviction, (3) the trial judge erred by admitting an unduly prejudicial photograph of the victim, and (4) the prosecutor inappropriately vouched for the credibility of the People's only identification witness during closing arguments. For the reasons that follow, we affirm the Superior Court's Judgment.

## I. FACTS AND PROCEDURAL HISTORY

On Sunday, June 10, 2007, Francis gave Kahlil Larcheveaux two dollars to purchase a drink from the bar of a club they were both frequenting. Larcheveaux did so, but the drink cost three dollars, so Larcheveaux requested that Francis pay him the extra dollar, and told Francis that if he failed to pay the extra dollar, Larcheveaux would drink the beverage himself. Francis then deliberately spilled the drink and told Larcheveaux that he was "coming for his two dollars the next day." (Supp. App. vol. I, 103.)

Thereafter, on Friday, June 15, 2007, Larcheveaux, while working with a team of construction workers to build an addition to his father's home on St. Thomas, walked across Brookman Road to go into a corner store. Once in the store, Larcheveaux encountered Francis again. Francis

375

informed Larcheveaux that, in recompense for the spilled drink, Francis took two DVDs from the store and told the owner that Larcheveaux would pay for them. Larcheveaux, who noticed that Francis was wearing a white hat, snatched the hat from Francis's head and rubbed his hands, still covered with dirt from the construction site, all over the hat. Francis responded by striking Larcheveaux over the head with a beer bottle. The two then started fighting in the store but were separated shortly thereafter. After the physical confrontation, Larcheveaux went outside, walked across the street to his father's work truck, and grabbed a length of metal pipe. With the pipe in hand, Larcheveaux then turned and began to walk back towards the store, but only got about halfway across the street before he noticed Francis coming towards him. Larcheveaux became concerned because, although he now had a weapon, Francis was still advancing on him. Larcheveaux, concerned that "something [wasn't] right," retreated to the construction site, when he noticed a gun in Francis's hand. Larcheveaux, unsure of what to do now that Francis had a gun, took cover behind a wall. (*Id.* at 110.) Larcheveaux witnessed Francis "pacing back and forth by the road" and "shout[ing] something," after which he heard the sound of at least two rounds being fired. (*Id.* at 108-11.) Following the shots, the other construction personnel who had been working with Larcheveaux also fled behind the wall. Larcheveaux noticed that one of those workers, Laurel Jeffers, was coughing and bleeding from a wound to the throat. Larcheveaux told Jeffers that they had to get him "to the hospital" and the two fled from behind the wall towards Larcheveaux's father's work truck. (*Id.* at 112.) Larcheveaux and Jeffers climbed into the truck and drove off towards the hospital. Neither Larcheveaux nor Jeffers wore a seatbelt. During the trip, Larcheveaux came across a police officer and a territorial marshal, whom he implored to help him get Jeffers to the hospital. However, the officers had to turn their vehicles around, so Larcheveaux drove on with the officers following behind with their lights and sirens on. Throughout the trip, Jeffers "couldn't say anything" but remained awake and continued "choking on his own blood." (*Id.* at 132-34.) On the way to the hospital, Larcheveaux's truck collided with another vehicle, which caused Jeffers to hit his head. The marshal called an ambulance, which was dispatched and arrived on the scene within three minutes of the dispatch. When the ambulance arrived, the EMT noted that Jeffers was unconscious, had irregular breathing, and a wound to his neck that was causing blood to flow into his airway. Additionally,

the EMT noticed that Jeffers had some blood on his forehead and swelling to his right eye and cheek. Once in the ambulance, the EMT provided Jeffers with emergency breathing assistance and suctioned the blood from his airway. When the ambulance reached the hospital fifteen minutes after arriving at the scene of the accident, Jeffers was no longer breathing and had no pulse. Shortly thereafter, Jeffers died.

Francis was subsequently arrested and charged, in an amended information, with Murder in the First Degree, V.I. CODE ANN. tit. 14, § 921, 922(a)(1); First Degree Assault, 14 V.I.C. § 295(3); Using or Possessing an Unlicensed Firearm During the Commission or Attempted Commission of a Crime of Violence, 14 V.I.C. § 2253(a); and Unauthorized Possession of Firearm Ammunition, 14 V.I.C. § 2256(a). At trial, Francis presented a two-part defense. First, he argued that Larcheveaux, the only witness who identified Francis as the shooter, was not credible. This argument was largely based on previous statements by Larcheveaux to the police, wherein he failed to identify Francis as the shooter. Second, he argued that the car accident was an intervening superseding cause of death, so he could not be found guilty of homicide.

Both the People and Francis presented expert witnesses to testify as to the cause of Jeffers's death. Dr. Francisco Landron, chief of pathology at the Roy Schneider Hospital and medical examiner for St. Thomas, testified on behalf of the People. Dr. Landron, who had performed the autopsy on Jeffers's body, testified that Jeffers died due to "a gunshot wound to the neck that produced massive hemorrhage. The decedent inhaled the blood in essence drowning in his own blood." (Supp. App., vol. II, 20.) The bullet missed both the carotid artery and jugular vein, but "perforated the larynx just below the vocal cords, that is, the windpipe. There was a lot of hemorrhage around the tube, the windpipe. . . . [T]he windpipe being exposed because of the wound, the blood went into the airway and was breathed into the lungs." (*Id.* at 27.). Dr. Landron opined that Jeffers's lungs weighed approximately twice their normal weight due to the blood which seeped down into the lungs through the perforation in the larynx. Dr. Landron also opined that the only injury Jeffers suffered in the car accident was a minor abrasion to his forehead, which was not serious enough to contribute to his death.

To counter Dr. Landron's testimony, Francis called Dr. William Manion, a pathologist and assistant medical examiner in New Jersey, to testify. First, Dr. Manion acknowledged that Jeffers died by drowning in

his own blood and that the blood was able to reach his lungs because of the gunshot wound in Jeffers's throat. However, Dr. Manion characterized the wound as one "that a person should survive." (*Id.* at 56.) First, he noted that the injury "did not involve major blood vessels" and that "the blood loss was very, very small in this case." (*Id.* at 55-56.) He went on to explain that "[t]he reason the person would survive is that, as long as the person is conscious and able to cough up blood, that person will keep their airway clear and be able to breathe." (*Id.*) Dr. Manion opined that Jeffers's coughing at the construction site and during the drive permitted him to clear his air passage as long as he was conscious. Dr. Manion concluded that the car accident had caused Jeffers to strike his head on the windshield, which dazed him, and while dazed Jeffers was unable to continue to cough up the blood blocking his air passages. According to Dr. Manion "most people, 90 percent, 95 percent, of people you get them to the emergency room . . . they're gonna survive this wound." (Supp. App. vol. II, 60.) Therefore, Dr. Manion determined that "the manner of this death [was] accidental, because there was a supervening or superseding [event], something extraordinary happened that lead [sic] to his death . . . because he was not going to die from that gunshot wound." (*Id.* at 61.)

On cross examination, Dr. Manion admitted that he never inspected Jeffers's body or performed an autopsy, but instead relied on Dr. Landron's autopsy report. On rebuttal, Dr. Landron disagreed with Dr. Manion's findings and testified that Jeffers was "taking in more blood tha[n] he could cough [up] and that's what ultimately cause[d] the death. It had nothing to do with the traffic accident." (*Id.* at 183.)

The jury returned a guilty verdict on all counts on February 14, 2008. On April 4, 2008, the Superior Court held a sentencing hearing and dismissed the unauthorized possession of firearm ammunition, merged the assault and murder charges, sentenced Francis to fifteen years for unauthorized possession of a firearm during the commission of an act of violence and to life without parole on the murder conviction. On April 8, 2008, Francis filed his timely notice of appeal,[1] and on April 18, 2008, the

---

[1] Supreme Court Rule 5(b)(1) provides that "[a] notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment." Therefore, even though Francis filed his

Superior Court entered its final Judgment reflecting its determinations at the sentencing hearing.

## II. JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over this criminal appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." A judgment in a criminal case is a final order within the meaning of section 32(a). *Brown v. People*, 49 V.I. 378, 380 (V.I. 2007).

The standard of review for our examination of the Superior Court's application of law is plenary, while the Superior Court's factual findings are only reviewed for clear error. *See St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). Moreover, we review the Superior Court's evidentiary rulings for abuse of discretion, unless its decision involves application of a legal precept, in which case this Court would exercise plenary review. *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008). We review a trial court's refusal to give specific jury instructions for an abuse of discretion. *Gilbert v. People*, 52 V.I. 350, 354 (V.I. 2009).

Finally, in reviewing the Superior Court's denial of Francis's motion for judgment of acquittal based on the sufficiency of the evidence, we exercise plenary review and apply the same standard as the trial court. *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009). When we consider challenges to the sufficiency of the evidence, this Court has stated that " 'we apply a particularly deferential standard of review. Following a criminal conviction, we view the evidence presented at trial in a light most favorable to the People.' " *Id.* (quoting *Smith v. People*, 51 V.I. 396, 398 (V.I. 2009)). Therefore, " '[w]e will affirm a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Smith*, 51 V.I. at 398).

## III. DISCUSSION

Francis presents four arguments in support of his appeal: (1) that he was entitled to have the trial court give an independent intervening cause

---

Notice of Appeal before the Superior Court's Judgment was entered into the docket, it was timely. *Accord Shoy v. People*, 55 V.I. 919, 924 n.2 (V.I. 2011).

instruction to the jury based on the evidence presented at trial, (2) that the People failed to present sufficient evidence on causation to sustain a conviction for first degree murder, (3) that the trial court erred by admitting a photograph of the victim in a head brace showing the wound in his neck because it was unduly prejudicial to the defense and (4) that the prosecutor impermissibly vouched for the veracity of Larcheveaux's testimony at trial. We consider each argument in turn.

### A. The Superior Court did not abuse its discretion by refusing to give an intervening act instruction.

At trial, Francis offered the following proposed instruction to be read to the jury: "in order for there to have been a homicide you must find that the gunshot wound to the throat of Mr. Jeffers was the actual cause of his death and that there was no independent intervening act without which he would not have died." (J.A. 63-64.) The trial court rejected the instruction without explanation. Francis argues that this rejection was an abuse of discretion because Dr. Manion's testimony put causation in issue and causation is an element of murder that should be determined by the jury.

█ To determine whether a trial court abused its discretion by refusing a proposed instruction, we evaluate whether (1) " 'the proffered instruction was legally correct,' " (2) " 'it was substantially covered by other instructions,' " and (3) " 'its omission prejudiced the defendant.' " *Phillips v. People*, 51 V.I. 258, 269 (V.I. 2009) (quoting *United States v. Pitt*, 193 F.3d 751, 755-56 (3d Cir. 1999)). Furthermore, we will not overturn a conviction unless the requested instruction (4) " 'represents a theory of defense with basis in the record.' " *Id.* at 269-70 (quoting *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006)). Because we find that the third requirement — prejudice to the defendant — is absent in this case, we do not address the other elements.

█ To prove that the defendant in a homicide prosecution caused the death of the victim, the People must prove that (1) but for the defendant's unlawful acts the victim would not have died, (2) the defendant's unlawful acts substantially contributed to the victim's death, and (3) the defendant's unlawful acts led to the victim's death in a natural and

continuous sequence, often called the chain of causation.[2] *See Auman v. People*, 109 P.3d 647, 662-63 (Colo. 2005); *State v. Hall*, 60 N.C. App. 450, 299 S.E.2d 680, 683 (N.C. Ct. App. 1983); *see also* 40 C.J.S. *Homicide* §§ 9, 10 (2010); 40 Am. Jur. 2d *Homicide* § 12 (2010). Francis restricts his argument to the third requirement, arguing that the car accident was an independent intervening act that severed the chain of causation.

 In *People v. Lopez*, 97 P.3d 277 (Colo. App. 2004), the Colorado Court of Appeals set forth the comprehensive test[3] for determining whether an independent intervening cause can break the chain of causation:

> Three elements must be satisfied to establish an independent intervening cause sufficient to relieve a defendant of responsibility for his or her conduct: (1) the defendant must not participate in the intervening cause; (2) the intervening cause is one but for which the death would not have occurred; and (3) the intervening cause must not have been reasonably foreseeable. An intervening cause is one that interrupts the natural and probable sequence of events following the defendant's acts and intervenes to cause the death. An intervening cause destroys the causal connection between the defendant's acts and the victim's injury, thereby becoming the cause of the injury.
>
> Simple negligence that contributes to the death of a victim is foreseeable and, as a matter of law, cannot be an independent intervening

---

[2] We note, of course, that some courts set out tests that either omit or reword one or more of the elements of causation that we have adopted. *See People v. Concha*, 47 Cal. 4th 653, 101 Cal. Rptr. 3d 141, 218 P.3d 660, 664 (Cal. 2009) (the victim's death must be the "natural and probable consequence of [the] defendant's act [in order for] . . . liability [to] . . . attach."). *See also People v. Woodard*, 367 Ill. App. 3d 304, 854 N.E.2d 674, 687, 305 Ill. Dec. 82 (Ill. App. Ct. 2006) (a defendant's act of injuring another must have contributed to his death to result in criminal liability); *State v. Dantonio*, 376 S.C. 594, 658 S.E.2d 337, 343 (S.C. Ct. App. 2008) (same). Nevertheless, we find the three factors set out above to be the most comprehensive test which provides the most guidance to both the trial courts and the juries they must instruct.

[3] Again, we recognize that some courts have different tests concerning an intervening event. *See, e.g., Brown v. Commonwealth*, 278 Va. 523, 685 S.E.2d 43, 46 (Va. 2009) ("[A]n independent, intervening act that alone causes the victim's injury or death is recognized as a superseding cause that will exempt the defendant from criminal responsibility for his or her conduct."). However, we find that the *Lopez* court sets out both the majority, and better considered, rule for determining an intervening event.

cause. However, gross negligence is unforeseeable behavior, and it may serve as an intervening cause. Gross negligence is conduct beyond simple negligence showing an extreme departure from the ordinary standard of care.

*Id.* at 282 (citations omitted). *See also People v. Schaefer*, 473 Mich. 418, 703 N.W.2d 774, 785 (Mich. 2005) ("The standard by which to gauge whether an intervening cause supersedes, and thus severs the causal link, is generally one of reasonable foreseeability."). In *Lopez*, the defendant was convicted of vehicular homicide for driving his car, while intoxicated, at high speed into the vehicle in which the victim was a passenger. The defendant argued that because the driver of the car in which the victim was a passenger turned left at an intersection despite oncoming traffic, thereby placing the vehicle in the path of the defendant, the trial court erred when it failed to give an intervening cause instruction. *Lopez*, 97 P.3d at 278, 282. The *Lopez* court rejected the defendant's argument, and held that the intervening event was foreseeable because "even if [the driver] made misjudgments, nothing in the record shows that her decision[] to turn left . . . constituted an extreme departure from the ordinary standard of care sufficient to support a finding of gross negligence." *Id.*

As the court found in *Lopez*, in this case, there is no evidence that the automobile accident was a result of gross negligence.[4] There is so little evidence concerning the automobile accident on the record that it is not clear whether Larcheveaux or the driver of the other vehicle caused the accident, much less that one of them did so while driving in a grossly negligent manner. Without evidence that the car accident was caused by grossly negligent behavior, that event could not serve as an independent intervening event that would break the chain of causation. *See id.* at 282.

■ ■ Likewise, the Michigan Supreme Court has noted that if a "physician is negligent in providing medical care to [a stabbing] victim and the victim later dies, the defendant is still considered to have . . . caused the victim's death because it is reasonably foreseeable that negligent medical care might be provided." *Schaefer*, 703 N.W.2d at 785-86. The court warned, however, that "[a]t the same time, *gross* negligence or intentional misconduct by a treating physician is not

---

[4] In fact, there is no evidence of simple negligence on this record either, only that an accident occurred.

reasonably foreseeable, and would thus break the causal chain between the defendant and the victim." *Id.* at 786. We find that analysis persuasive in this context — it is reasonably foreseeable that a victim who was shot in the throat will seek medical attention by way of an automobile and that the automobile may be involved in an accident en route to the hospital. Without some evidence that the accident was caused by gross negligence or intentional misconduct by some third party, or that the accident caused the victim's death due to an unrelated wound, an automobile accident on the way to receive medical attention is a reasonably foreseeable event following a shooting. Here, there was no evidence of gross negligence or intentional misconduct by a third party, and both experts testified that the automobile accident caused no wound which was fatal, or even serious, by itself. Accordingly, the automobile accident in this case was a reasonably foreseeable event which could not break the chain of causation and therefore Francis suffered no prejudice from the Superior Court's refusal to give a causation instruction on intervening events. Because Francis suffered no prejudice from the trial court's refusal to give his proffered instruction on causation, the trial court did not abuse its discretion.

### B. The evidence of causation was sufficient to sustain a conviction.

██ Francis next asserts that Dr. Manion's testimony conclusively established that Jeffers's wound was not fatal, and thus there was insufficient evidence to convict him of murder due to the intervening event of the car wreck. First, Francis's sufficiency argument, once again based on causation, ignores the jury's right to disregard expert testimony and make independent determinations. *See Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006). Francis bases this argument entirely on Dr. Manion's testimony. Specifically, Francis relies on Dr. Manion's opinion that Jeffers's wound would not have resulted in his death had the automobile accident never occurred. However, the jury was under no obligation to accept Dr. Manion's diagnosis that Jeffers's throat wound was not fatal by itself. The jury, who heard lay testimony about the wound in Jeffers's throat as well as Dr. Landron's determination that the throat wound was fatal and that the car accident did not cause or affect Jeffers's death, was free to disregard Dr. Manion's opinion. We note that Dr. Manion's opinion rests on a number of assumptions that the jury was

under no obligation to accept: that Jeffers would remain conscious and capable of clearing his airway until he reached the hospital and that Jeffers was able to clear enough of the blood from his airways with each cough to prevent a buildup of blood in his lungs over time. Therefore, because there was conflicting testimony on the seriousness of the wound, a rational jury was permitted to disregard Dr. Manion's testimony and rely on Dr. Landron's determination or make their own determination from the lay testimony that the wound was fatal. Additionally, we have already determined that the automobile accident in this case was a reasonably foreseeable event, and thus could not have broken the chain of causation. Therefore, even if the jury completely accepted Dr. Manion's testimony that the car accident contributed to Jeffers's death, that testimony could not serve to sever the chain of causation back to the original gunshot wound and would not render the evidence of causation insufficient.

Accordingly, because the jury could have rationally convicted Francis regardless of whether it accepted all of Dr. Manion's testimony or exercised its prerogative as finder of fact to reject Dr. Manion's testimony and accept Dr. Landron's, there was sufficient evidence of causation on the record to convict Francis of murder.

## C. The Superior Court did not abuse its discretion by permitting a picture of the victim into evidence.

Francis argues that the photograph admitted into evidence[5] showing Jeffers's head (1) was not relevant and thus inadmissible and (2) even if relevant, it was unduly prejudicial under title 5, section 885 of the Virgin Islands Code.[6] Therefore, Francis argues, the trial court violated his due process rights by admitting the prejudicial photograph and deprived him

---

[5] The photograph in question was one of three photographs that the People offered into evidence to show the nature of the victim's injury. The trial judge chose the one he felt was "least inflammatory" and permitted the People to show the jury that one. (Supp. App. I 208.)

[6] Title 5, section 885 stated:

Except as in this chapter otherwise provided, the judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury, or (c) unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered.

5 V.I.C. 885 (1997).

of a fair trial.[7] The picture depicts Jeffers's head and shoulders, with his head tilted back by the medical brace in which it is slung. The wound in his throat is clearly visible. The picture also depicts the breathing and feeding apparatus placed in his mouth. It is not clear from the photograph whether Jeffers was alive at the time the photograph was taken. This was the only photograph of Jeffers entered into evidence by the People.

To determine whether the evidence was admissible, we turn to title 5, section 777 of the Virgin Islands Code, which was in effect at that time and stated that "[e]xcept as otherwise provided . . . all relevant evidence is admissible." 5 V.I.C. § 777 (1997). Section 771 of the same title defined "relevant evidence" as "evidence having any tendency in reason to prove any material fact." 5 V.I.C. § 771 (1997).

Here, the photograph was clearly relevant evidence. The photograph shows the wound that killed the victim, including both its size and location, which is material to any murder prosecution where the fatality of the wound is in issue. *See Middleton v. Roper*, 498 F.3d 812, 820 (8th Cir. 2007) (holding that gruesome photograph and videotape were relevant in light of expert witness discussion of fatal injuries).

We turn, then, to whether the otherwise admissible evidence should have been excluded under some specific exception to the general rule permitting the entry of relevant evidence. Title 5, section 885 of the Virgin Islands Code granted a trial judge wide discretion to determine if an otherwise relevant piece of evidence was so prejudicial to the defendant as to substantially outweigh its probative value. *See* 5 V.I.C. § 885 (1997); *Mulley v. People*, 51 V.I. 404, 411 (V.I. 2009); *see also People v. Todmann*, 53 V.I. 431, 442 (V.I. 2010) (" '[I]f judicial restraint is ever desirable, it is when [an unfair prejudice] analysis of a trial court is

---

[7] Francis appears to be confused as to whether Federal Rule of Evidence 403 or the old section 885 of title 5 of the Virgin Islands Code is the correct standard. (*Compare* Appellant Br. 18 (citing to section 885); *with* Appellant Reply Br. 6 (citing to FED. R. EVID. 403).) At the time of Francis's trial, section 885 was still in force, and thus it is to that section we must address our discussion. *See Brown v. People*, 54 V.I. 496, 512 n.10 (V.I. 2010) (explaining local evidence law and its changes, specifically noting that the Federal Rules of Evidence were adopted by the Legislature on March 26, 2010 and signed into law by the Governor on April 7, 2010). The point is largely academic for this case, however, as the two sections are virtually identical in their operative language. *See Mulley v. People*, 51 V.I. 404, 411 (V.I. 2009) (explaining that, because FED. R. EVID. 403 and section 885 are so similar, this Court could look to guidance from federal courts interpreting rule 403 for guidance with section 885).

reviewed by an appellate tribunal.' Thus, we may not reverse the trial court's determination under Rule 403 or 5 V.I.C. § 885 unless we find that the court acted arbitrarily or irrationally." (quoting *Gov't of the V.I. v. Albert*, 241 F.3d 344, 347 (3d Cir. 2001))). " 'The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.' " *Mulley*, 51 V.I. at 411-12 (quoting *Old Chief v. United States*, 519 U.S. 172, 180, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997)). " 'Unfair prejudice is measured by the degree to which a jury responds negatively to some aspect of the evidence unrelated to its tendency to make a fact in issue more or less probable.' " *Krepps v. Gov't of the V.I.*, 47 V.I. 662, 674 (D.V.I. App. Div. 2006) (quoting *Lesko v. Owens*, 881 F.2d 44, 55 (3d Cir. 1989)).

▮▮ We conclude that the Superior Court did not abuse its discretion by permitting the People to introduce the photograph into evidence. The location and seriousness of the wound were particularly material in this case, as a large portion of Francis's defense rested on the claim from his expert that Jeffers's wound was not lethal. The picture permitted the jury to get a better understanding of exactly, what kind of wound was suffered and to draw independent conclusions about the injury. The medical apparatus holding Jeffers's head, which is Francis's primary objection to the photograph (Appellant Reply Br. 6), does not make it unduly prejudicial as "admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value." *United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007). Given the substantial probative value of the jury getting a picture of the highly disputed wound, we cannot find that the Superior Court acted irrationally where it found that the picture's probative value was not substantially outweighed by whatever little prejudice was caused by the medical apparatus.

### D. The Superior Court did not err when it refused to grant a new trial based on the prosecutor's statements during closing.

▮▮ Francis also argues that certain statements made by the People in closing arguments constituted impermissible vouching that require reversal. " 'Improper 'vouching' occurs where a prosecutor suggests that she has reasons to believe a witness that were not presented to the jury.' "

*Mulley*, 51 V.I. at 414 (quoting *United States v. Rivas*, 493 F.3d 131, 137 (3d Cir. 2007)). We recently noted that

> A prosecutor's vouching for the credibility of a government witness raises two concerns: (1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Farrington v. People*, 55 V.I. 644, 55 V.I. 644, 656-57 (V.I. 2011).

Francis identifies four instances of alleged vouching in the People's closing, the first three in the main body of the closing and the last in the People's rebuttal:[8]

1. There is no indication that the relatives of Mr. Jeffers had found any fault with Mr. Larcheveaux's actions. And in point of fact, he was a hero to even make such an effort. He's also a hero to come testify in this court . . . .

2. But he came back at the request of the Government so as to testify on this case, because he obviously had a concern for Mr. Jeffers' life. He also have [sic] respect for Mr. Jeffers and what has happened to him.

3. That he was challenged more than once to provide the information. That he was pursued until he had provided as close [sic] key an [sic] information as possible because the Government want [sic] to make sure, the People want to make sure that they are getting the truth, the whole truth and nothing but the truth before they made an arrest.

4. I don't think that there's any coverup. I think he testified honestly just like he said, he was afraid. He was afraid of these

---

[8] Francis only objected to the first and fourth instance of this conduct, but since the second -and third follow right on the heels of the first, apparently overruled, objection, duplicative objections were unnecessary to preserve the second and third instances for consideration on appeal. *See Douglas v. Alabama*, 380 U.S. 415, 420-23, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). Francis also claims this ground for relief was raised in his motion for acquittal, although that motion is not included in our materials in violation of our rules. Regardless, we will review all of the instances *de novo* rather than under plain error for the second and third.

people, and you will see in his statement he said, 'I don't know who to trust'. These guys live around where I live, I live in the exact area with the construction site - the scene where the incident took place. I have to go there. And I'm afraid for fear [sic] what they may do because even prior to this incident he had been threatened.

(Supp. App. II 225-30; J.A. 68.)

██ To determine if the People engaged in improper vouching, we require that a "defendant must show: (1) the prosecutor's conduct or remarks were improper, and (2) the conduct or remarks affected the trial in a manner that made the trial unfair and affected the defendant's substantial rights." *Farrington*, 55 V.I. at 655-56.

██ To meet the first requirement, that the prosecutor's remarks or actions constitute improper vouching, we have two criteria which must be met: (1) "the prosecutor suggests to the jury that the witness is telling the truth [(2)] because of personal knowledge the prosecutor has about the witness' testimony or ability to be truthful." *Id.* at 656. The assurance may be based on either "an explicit or implicit reference to either personal knowledge of the prosecuting attorney or information not contained in the record." *United States v. Walker*, 155 F.3d 180, 185 (3d Cir. 1998).

██ In this case, the first instance identified by the defendant was impermissible vouching. By juxtaposing that there was no indication that Jeffers's family found any fault with Larcheveaux's actions with the statements of him being a "hero," the People gave the impression that the prosecutor knew that the family felt Larcheveaux was being heroic and thus trustworthy by coming to testify — which is a fact that was not testified to by any member of Jeffers's family.

██ ██ On the other hand, the second instance identified by the defendant was clearly not impermissible vouching. Larcheveaux's testimony establishes that he came back to the Virgin Islands to testify at the People's request. Furthermore, the statement of Larcheveaux's concern for Jeffers's life is a reasonable inference drawn from the testimony heard by the jury; the jury heard that Larcheveaux braved the possibility of additional gunfire to get Jeffers loaded into the truck and drive him to the hospital. *See United States v. Young*, 470 U.S. 1, 8 n.5, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) ("The prosecutor may argue all

reasonable inferences from evidence in the record." (quoting ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980))).

However, the third instance, like the first, was impermissible vouching. The prosecuting attorney indicated that the key identification witness should be considered more credible with each statement, assumedly culminating with the trial testimony as the most credible statement, because that is how government investigations function. This is little better than, and essentially the same as, the statement "We don't take liars. We don't put liars on the stand. We don't do that[,]" which the Third Circuit decried as impermissible vouching. *United States v. DiLoreto*, 888 F.2d 996, 999 (3d Cir. 1989). The government is simply not permitted to assert that a witness is more or less credible because of the manner in which government investigations are handled. *See id.*

Finally, the fourth identified instance was not impermissible vouching. Detective Stout testified that Larcheveaux informed him that he left the Virgin Islands shortly after the shooting due to being threatened. Detective Stout also testified that Larcheveaux was frightened of the area where he lived, the same area Jeffers was shot, because Francis lived in the area. Therefore, the statements in the fourth instance were all inferences that could reasonably be drawn from the trial testimony and were thus not based on some knowledge gained from outside the evidence the jury heard.

Moving on to the second step of the analysis, we must next determine if the two instances of impermissible vouching, the first and third above, require reversal. The Supreme Court of the United States warned that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young*, 470 U.S. at 11. To guide this determination, we consider (1) " 'the scope of the objectionable comments and their relationship to the entire proceeding,' " (2) " 'the ameliorative effect of any curative instructions given,' " and (3) " 'the strength of the evidence supporting the defendant's conviction.' " *Mulley*, 51 V.I. at 414 (quoting *United States v. Zehrbach*, 47 F.3d 1252, 1264 (3d Cir. 1995)).

The scope of the two cases of vouching was the same — the prosecutor impermissibly suggested that Larcheveaux's testimony was credible based on evidence the jury did not hear. We recognize, of course,

that Larcheveaux's credibility was a key issue in the case, since he was the only witness that placed the gun in Francis's hand. On the other hand, these two comments were all of the impermissible conduct brought to our attention over several days of trial, including testimony by fifteen witnesses and the entry of nineteen exhibits, which generated nearly 700 pages of transcript. We also note that the trial judge gave instructions both at the start of trial and during the final jury instructions that statements by counsel were not evidence and could not be considered in their determination of guilt or innocence. (Supp. App. I 30; Supp. App. II. 583-84.) These instructions, while perhaps not as effective as an immediate instruction at the time of objection, still reduced any potential prejudice Francis suffered. *See Mulley*, 51 V.I. at 415 ("Thus, although the judge did not issue an immediate specific curative instruction, its general instruction reduced any prejudice from the improper remarks in the People's closing argument."). Finally, we note that the prosecutor himself stated throughout his closing and rebuttal that it was the jury's job to determine credibility based on the evidence presented at trial. (Supp. App. 531-32; 538; 542; 554.) Therefore, in these circumstances, we cannot say that the fairness of Francis's trial was compromised by the People's statements during closing arguments.

## IV. CONCLUSION

Because Francis cannot show that he was prejudiced by the Superior Court's refusal to give an intervening cause instruction, the Superior Court's refusal was not an abuse of discretion. Additionally, Francis has failed to convince us that there was insufficient evidence to convict him of Murder in the First Degree based on causation. Likewise, the trial court did not abuse its discretion by admitting a photograph of the wound, the seriousness of which was highly contested by the parties' experts. Finally, while the People engaged in some improper vouching with respect to the key witness at trial, we do not find that the vouching affected the fairness of Francis's trial. Therefore, we affirm the Superior Court's April 18, 2008 Judgment.