**RUDETTE CHRISTOPHER, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2010-0037

Supreme Court of the Virgin Islands

September 28, 2012

501

KELE ONYEJEKWE, ESQ., Territorial Public Defender, St. Thomas, USVI, *Attorney for Appellant.*

TIFFANY V. MONROSE, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

Before: HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(September 28, 2012)

CABRET, *Associate Justice.* Following a jury trial, Rudette Christopher was found guilty and sentenced on one count of third degree assault and one count of unauthorized possession or use of a dangerous weapon during the commission of a crime of violence. Christopher challenges his convictions on multiple grounds. For the reasons that follow, we affirm the Superior Court's June 15, 2010 Judgment and Commitment.

## I. FACTS AND PROCEDURAL HISTORY

This case revolves around an incident that occurred just after J'ouvert[1] on April 30, 2009. At trial, the witnesses, including the defendant, all agreed on the following general circumstances of that day. Shortly after noon on April 30, 2009, Christopher and Curtis John-Jules got into an argument or altercation at the Village.[2] The two were separated by on-lookers and went separate ways. John-Jules was taken by his cousin, Glenel Thomas, out of the Village to Thomas's pickup truck. At the vehicle, Christopher and John-Jules once again encountered one another, and at the end of that encounter, Christopher stabbed John-Jules in the chest with an ice pick. Christopher dropped the ice pick and fled the scene, but was apprehended immediately by police near the Village. Because the ice pick punctured his heart, John-Jules eventually went into

---

[1] In the United States Virgin Islands, J'ouvert is a part of the Carnival celebration. *See United States v. Ubiles*, 224 F.3d 213, 215 (3d Cir. 2000). It begins early in the morning, before sunrise, and lasts throughout the morning hours. *See id.* During J'ouvert, bands, typically playing calypso music, march through the streets while fans of each band dance behind in an impromptu parade. *See id. See also United States v. McIntosh*, 289 F.Supp.2d 672, 673 (D.V.I. 2003).

[2] The Village is another part of the Carnival celebration. Carnival goers can generally find food, more music, local and other Caribbean entertainment, rides, and games in the Village. *See* Harold W.L. Willocks, *The Umbilical Cord: The History of the United States Virgin Islands From Pre-Colombian Era to the Present* 20-22 (1st ed. 1995).

cardiac arrest at the hospital and, although the medical professionals saved his life, he suffered brain damage due to the attack.

Christopher was arrested and charged in a two-count information with assault in the third degree, in violation of V.I. CODE ANN. tit. 14, § 297(2), and possession or use of a dangerous weapon during the commission of a third degree assault, in violation of 14 V.I.C. § 2251(a)(2)(B).

At trial, the jury heard vastly different accounts of what happened at each of the two encounters. The People first called Aaron Renault, who testified to seeing both the encounter in the Village and the stabbing at Thomas's vehicle. Renault testified that the first encounter between Christopher and John-Jules was not violent, but simply a heated argument. After the men were separated, Renault testified that he followed John-Jules and Thomas to Thomas's truck. Finally, Renault testified that he witnessed Christopher approach the passenger side of Thomas's truck, where John-Jules was sitting, open the door and, after a brief exchange, plunge the weapon into John-Jules's chest.

Next, the People called Lucia Huggins. Huggins testified that she also witnessed both the initial encounter between Christopher and John-Jules and the stabbing. Huggins testified that, while in the Village, she became aware of the altercation between Christopher and John-Jules when John-Jules slapped Christopher twice on the back of the head. Huggins testified that the incident was then broken up with Christopher asking John-Jules what he had done to deserve the attack. A minute later, after the initial conflict had been broken up, Christopher attacked John-Jules from behind and placed him in a choke hold. That attack was also broken up by onlookers. Huggins, who had followed John-Jules and Thomas from the Village, testified next that Christopher approached the passenger side of the truck where John-Jules was sitting. The two ended up shoving one another while Thomas tried to break up the fight. Finally, Christopher and John-Jules ended up wrestling, during which Christopher drew out the ice pick and stabbed John-Jules. On cross-examination, Huggins acknowledged that, at some point before the two started wrestling, Christopher had retrieved a shovel from the back of Thomas's truck, but that Thomas took it away from Christopher before the fight began. According to Huggins, at the time of the stabbing, Christopher was unarmed. Finally, according to Huggins, both John-Jules and Christopher were intoxicated at the time of both incidents.

Next, the People called Glenel Thomas as their final witness to see either incident between Christopher and John-Jules.[3] Thomas did not witness the first confrontation between Christopher and John-Jules. The police officer who responded to the initial confrontation after it had been broken up by bystanders escorted John-Jules to Thomas and asked Thomas to take John-Jules home. At his truck, Thomas witnessed Christopher approach the vehicle on the passenger side and begin a new verbal altercation with John-Jules. Thomas testified that he was trying to pacify the two men and physically push them apart when Christopher drew his weapon and stabbed John-Jules. On cross examination, Thomas testified that neither he nor John-Jules ever struck Christopher during the encounter outside of the truck. Thomas also confirmed that before the physical confrontation, John-Jules had retrieved a shovel. Thomas testified that he took the shovel before the confrontation began, and that both he and John-Jules were unarmed at the time of the stabbing.

Christopher took the stand himself to rebut the prosecution's witnesses. Christopher did not deny the stabbing, but claimed that he acted in self-defense. Christopher testified that, in the Village following J'ouvert, he was standing with a friend, Earl Gregoire. While standing with Gregoire, Christopher testified that he was struck twice in the back of the head and once across the face by John-Jules without provocation. After being separated by onlookers, Christopher testified that he left the Village and retreated to a nearby park to clear his head. After a few minutes, he left the park to head back to the Village to retrieve his phone, which he had lent to a friend. On his way back to the Village, he came across Thomas's truck and Thomas stepped out to block Christopher's path. Christopher testified that while he argued with Thomas, John-Jules stepped out of the truck and struck Christopher on the back of the head. According to Christopher, Thomas then grabbed and restrained Christopher while John-Jules choked and punched him five or six times. After the first five or six blows, Christopher stabbed John-Jules in the chest in an attempt to end the attack. Christopher testified that John-Jules continued the assault for another five or six blows after being stabbed

---

[3] John-Jules himself did not take the stand. His mother did, however, and testified that John-Jules, on account of his brain damage, was unable to remember or describe the events of April 30, 2009.

before collapsing, and Christopher was then able to escape Thomas's grasp.

The jury returned a guilty verdict on both counts on March 9, 2010. On June 15, 2010, the Superior Court entered its judgment and commitment, which sentenced Christopher concurrently to three years of incarceration, all but six months of which were suspended, for assault in the third degree and seven and a half years of incarceration for possession of a dangerous weapon during the commission of a crime of violence. On June 21, 2010, Christopher filed a timely notice of appeal. *See* V.I. S. CT. R. 5(b).

## II. JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over this criminal appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." "A judgment in a criminal case is a final order within the meaning of" section 32(a). *Francis v. People*, 56 V.I. 370, 379 (V.I. 2012).

## III. DISCUSSION

Christopher presents three arguments in support of his appeal: (1) that the trial court erred by sustaining objections to questions concerning the victim's allegedly violent past, (2) that the trial court erred in its jury instructions by defining the "deadly weapon" element of the assault count by reference to the definitions contained in the possession of a dangerous weapon statute, and (3) that the People set out insufficient evidence to disprove self-defense. We consider each argument in turn.

### A. The trial court did not err by sustaining objections to questions concerning the victim's alleged violent past.

Christopher first argues that the trial court erred when it sustained objections to questions from his counsel seeking information about specific instances of violent behavior by the victim. The stricken testimony from Christopher alleged that John-Jules had beaten up people on several occasions, had "gun butt[ed]" and robbed others in a number of instances, and had gained his nickname "Father" by assaulting a priest. (J.A. vol. II, 76-80.) Christopher specifically argues that this evidence's exclusion was an error under Federal Rule of Evidence 404(b).

Christopher goes on to argue that this error prejudiced him because it prevented him from requesting an instruction that John-Jules's hands could be considered deadly weapons for purposes of determining his self-defense claim.

We review the Superior Court's decision to admit or strike testimony for an abuse of discretion. *See Ritter v. People*, 51 V.I. 354, 359 (V.I. 2009). For the reasons that follow, we conclude that Christopher's arguments lack merit.

First, as the People correctly point out, Christopher is arguing under the wrong law. As this Court has previously stated, the Federal Rules of Evidence did not become the controlling evidentiary rules in the Superior Court until the Governor signed Act No. 7161 on April 7, 2010. *Blyden v. People*, 53 V.I. 637, 658 (V.I. 2010). Before that, and during Christopher's trial on March 8 and 9, 2010, the 1953 version of the Uniform Rules of Evidence (URE), codified at 5 V.I.C. §§ 771-956, applied to all evidentiary issues in the local Virgin Islands courts. *See id.* Therefore, it is to the URE, specifically 5 V.I.C. §§ 886 & 887, to which we must turn to determine whether the Superior Court erred.

■ Section 886 stated that "[w]hen a person's character or a trait of his character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation or evidence of specific instances of the person's conduct, subject, however, to the limitations of section[] 887 . . . ." Accordingly, under the URE, specific instances of conduct could be used to prove reputation subject to the limitation codified at section 887. Section 887 stated, in pertinent part, that:

> Subject to section 888 of this title, when a trait of a person's character is relevant as tending to prove his conduct on a specified occasion, such trait may be proved in the same manner as provided by section 886 of this title, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible . . . .

Reading these two sections in concert, under the URE a criminal defendant could prove a bad trait of that witness's character by opinion or reputation. However, under section 887, to prove that on a specific occasion a witness acted in accordance with his or her bad character, the court is required to reject any evidence of specific prior bad acts except evidence of a conviction

of a crime. *See Brown v. People*, 54 V.I. 496, 514 (V.I. 2010) (" '[A]s con-trasted to . . . [section 886] . . . [section 887] definitely requires rejection of evidence of specific behavior to prove a character trait except evidence of conviction of a crime.' " (quoting 5 V.I.C. § 887, comm'rs cmt.)). Here, however, Christopher argues that the prior bad acts testimony was not of-fered to show that John-Jules acted in conformity with a violent character, but was instead offered to show that Christopher reasonably feared that John-Jules would inflict serious bodily injury on him, which is a necessary component of a claim of self-defense.

 Christopher's argument — that section 887's language does not mandate the exclusion of prior bad acts testimony other than proof of a conviction where the prior bad acts are offered to show a criminal defendant's reasonable fear of his victim in a self-defense claim — is one of first impression in the Virgin Islands. However, the federal courts have addressed the same argument when interpreting the language from Federal Rule of Evidence 404(b), which utilizes similar language to section 887:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to *show action in conformity therewith.* It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the ac-cused, the prosecution in a criminal case shall provide reasonable no-tice in advance of trial, or during trial if the court excuses pretrial no-tice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b) (emphasis added). Construing this language, the fed-eral appellate courts have held that when prior bad acts are offered from the defendant's personal knowledge to prove the necessary state of mind for self-defense — that is, that the defendant had a reasonable fear of imminent injury — then Rule 404(b) does not bar the evidence's admission. *See United States v. Gregg*, 451 F.3d 930, 935 (8th Cir. 2006) ("Although spe-cific acts evidence is not admissible to prove a victim acted in conformity with his character . . . such evidence may be admissible under Rule 404(b) to prove a defendant's state of mind."); *United States v. Saenz*, 179 F.3d 686, 688 (9th Cir. 1999) ("One of the elements of self defense is the defendant's reasonable belief that his use of force was necessary. To support the rea-

sonableness of his belief, Saenz sought to introduce evidence that he knew (1) that the victim had recently been carrying brass knuckles and a length of pipe, and (2) that the victim had sought to inflict serious injury on a relative because the relative had slighted him. The district court erred when it concluded that this evidence was inadmissible as a matter of law under Federal Rule of Evidence 404(b)." (internal citation omitted)). *See also Gov't of the V.I. v. Carino*, 631 F.2d 226, 229-30, 17 V.I. 623 (3d Cir. 1980) ("Carino sought to introduce Richardson's conviction for manslaughter of her prior boyfriend to 'demonstrate the fear' and 'the state of mind' of [the] defendant at the time of the incident. Although there is no specific reference in the Federal Rules of Evidence to admissibility for that purpose, we do not read the Rules as changing the prior precedent under which certain acts of violence by the victim are admissible to corroborate defendant's position that 'he reasonably feared he was in danger of imminent great bodily injury'.... Therefore, the evidence of Carino's knowledge of Richardson's conviction was admissible under Rule 404(b) to show fear or state of mind." (internal citation omitted)). Because Rule 404(b) and section 887 utilize similar language, we find these authorities persuasive in interpreting section 887. *See Mulley v. People*, 51 V.I. 404, 411 (V.I. 2009) (holding that interpretations of federal evidence rules may be persuasive to our interpretation of the URE where a federal rule utilizes language similar to that appearing in the URE). Accordingly, where a criminal defendant offers prior bad acts evidence pertaining to a victim's violent nature in order to show reasonable fear of imminent bodily harm, giving rise to a claim of self-defense, then the exception embodied in section 887 — which specifically addresses proof that a witness acted in conformity with the witness's character — does not apply. Instead, the plain language of section 886, providing that character may be proven by specific instances of conduct unless excluded by section 887, requires that when the defendant seeks to offer evidence of a victim's prior violent acts to prove his own reasonable fear of bodily injury, such evidence is admissible.

██ With that standard in mind, we turn to Christopher's argument that the trial court abused its discretion by striking Christopher's testimony concerning John-Jules's prior bad acts. However, we note that his argument does not accurately reflect the record. Christopher first sought to introduce as background information that he knew of specific prior

violent acts in which John-Jules had engaged.[4] At that time, there was no testimony regarding Christopher's state of mind and his attorney did not argue that the evidence was offered to support Christopher's belief that he was in danger of grievous bodily injury. Indeed, up until that time, Christopher had yet to testify as to any of the events that happened on April 30, 2009. Nevertheless, the People objected to the prior bad acts testimony and the Superior Court struck all of it. Immediately after the Superior Court struck the testimony, Christopher gave his own version of the events that occurred on April 30, 2009, admitting to the stabbing but claiming he only acted in self-defense. After setting this foundation for self-defense, the court permitted Christopher to testify, over the People's objection, that he knew "John-Jules a long time" and knew "his character" and accordingly felt his "life was in danger." (J.A. vol. II 103.) Christopher went on to testify that:

> Q. Why did you feel your life was in danger?
> A. Because I know Curtis John-Jules. I know what he is capable of doing. And I know what he did already. And I have seen him actually do it.
> Q. What's it?
> A. Butt people. Gun butt people. I have been in the area. I've been there when he Curtis John-Jules did it already. But we never get ourself in no kind of —

---

[4] For instance, Christopher was asked, by his attorney on direct, and answered:

> Q: How did you meet [John-Jules] in 1989?
> A: Well, I know him by beating up on people, beating people.

(J.A. vol. II 76.) Also, on direct, Christopher was asked and answered:

> Q: When you say "problem," what do you mean? What have you observed Mr. Charles doing? What have you personally observed of Mr. Charles?
> A: John-Jules.
> Q: John-Jules, yes.
> A: Gun butt people, rob people.

(*Id.* at 79.) Finally, Christopher was asked and answered:

> Q: Now, did you know him as Curtis John-Jules before this incident?
> A: No, I didn't know his right name. But I know him as Father.
> Q: How do you know him as Father? How did you get to know that people call him Father?
> A: Because he beat up a priest in his village.

(*Id.* at 79-80.)

Q. But this incident didn't involve you, so you didn't get involved in that?

A. No, never. Never. But I witness already.

(*Id.* at 103-04.) The Superior Court correctly excluded Christopher's testimony concerning John-Jules's prior bad acts when it was offered only as background and correctly permitted the same testimony when it was offered to show Christopher's state of mind at the time of the stabbing. Accordingly, we find that the Superior Court did not abuse its discretion — once it became clear that John-Jules's prior bad acts were being offered not as propensity evidence but, instead, to support Christopher's claims of self-defense, the evidence was correctly admitted.

██ We note that the scope of the bad acts that John-Jules allegedly performed was not the same in both sets of testimony. Specifically, in Christopher's first discussion of John-Jules's violent past acts, he mentioned that John-Jules received his nickname "Father" by assaulting a priest. (J.A. vol. II, 76-80.) That testimony, which was stricken, was not repeated when Christopher was permitted to testify to John-Jules's prior bad acts later. Even if we were to hold — which we do not — that the Superior Court abused its discretion by striking the assaulting testimony before the foundation for self-defense was laid without any indication that the testimony was being offered to prove Christopher's state of mind, any error would be harmless. Here, the jury heard other, more serious, prior violent acts allegedly committed by John-Jules and still rejected Christopher's self-defense theory. Indeed, we note that of the four varying versions of the events of that day from the eyewitnesses, only Christopher's own testimony supported any inference of self-defense. Consequently, we hold that there is not a reasonable probability that had the jury been permitted to consider the priest-assaulting testimony, the verdict would have been different. *See Elizee v. People*, 54 V.I. 466, 479 (V.I. 2010) (holding that an error must be " 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial" or it is harmless (quoting *United States v. Marcus*, 130 S. Ct. 2159, 2164, 176 L. Ed. 2d 1012 (2010))).

### B. The Superior Court did not commit plain error in its "deadly weapon" instruction.

Next, Christopher argues that the trial court's charge to the jury concerning the deadly weapon requirement of assault in the third degree,

14 V.I.C. § 297(2),[5] mistakenly drew the "dangerous or deadly" knife definition from the statute criminalizing carrying or using dangerous weapons, 14 V.I.C. § 2251(a)(2).[6] He argues that the "dangerous" weapon statute at section 2251(a)(2) requires a lower standard of proof than the "deadly" weapon element of section 297(2), and thus he was convicted using a lower standard. The trial court's full charge to the jury on the deadly weapon requirement was:

> Now, the phrase "deadly" or "dangerous weapon," as used in Count One, means any instrument or device capable of inflicting serious bodily injury or causing the death of a person. Both the physical capability of the object used and the manner in which the object is used may be considered by the jury in determining whether the object is a deadly weapon.

(J.A. vol. II 315.) Christopher's argument takes no exception to the substance of the instruction in general, only the first line's use of the phrase "dangerous weapon." Christopher notes that the word "dangerous" does not appear in the statute defining assault with a deadly weapon, 14 V.I.C. § 297(2), and thus Christopher argues that the Superior Court must have imported the "dangerous weapon" standard from the statute defining possession of a dangerous weapon during the commission of a crime of violence, 14 V.I.C. § 2251(a)(2). In essence, Christopher argues that the Superior Court's inclusion of the word "dangerous" in the section 297(2) assault instruction caused the jury to look at the elements in the section 2251(a)(2) possession instruction and apply those standards instead. As Christopher never objected to the jury instruction, we review only for plain error. *Williams v. People*, 55 V.I. 721, 727 (V.I. 2011) (citing *Francis v. People*, 52 V.I. 381, 390 (V.I. 2009)); *see also Hightree v. People*, 55 V.I. 947, 950 (V.I. 2011) (noting that plain error requires (1) an error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that affected the fairness, integrity, or public reputation of judicial proceedings).

---

[5] 14 V.I.C. § 297 provides that "[w]hoever, under circumstances not amounting to an assault in the first or second degree — ... (2) assaults another with a deadly weapon ... shall be fined not less than $500 and not more than $3,000 or imprisoned not more than 5 years or both."

[6] 14 V.I.C. § 2251 provides that "[w]hoever ... (2) with intent to use the same unlawfully against another, has, possesses, bears, transports, carries or has under his proximate control, a dagger, dirk, dangerous knife, razor stiletto, or any other dangerous or deadly weapon ...."

■ ■ To determine whether the Superior Court erred in its jury instructions, we must view the instructions as a whole to determine whether they were "misleading or inadequate to guide the jury's deliberation." *Prince v. People*, 57 V.I. 399, 409 (V.I. 2012) (quoting *Fleming v. People*, 775 F. Supp. 2d 765, 768, 55 V.I. 1016 (D.V.I. App. Div. 2011)). In *Prince*, we addressed whether using the phrases "deadly weapon" and "dangerous weapon" interchangeably in jury instructions under sections 297 and 2251 was plain error. First, we noted that the basic premise of Prince's argument — that the words "deadly" and "dangerous" have a significantly different meaning — is not supported by most legal authorities. *Id.* ("A deadly weapon is generally described as any firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death. In some states the definition encompasses the likelihood of causing either death or serious physical injury. Likewise, the term dangerous weapon is defined as being an object or device, that because of the way it is used, is capable of causing serious bodily injury. Both definitions are similar, except that the term deadly weapon includes a likelihood of causing death." (internal quotation marks, citations, and alterations omitted)). We went on to point out that "[t]his common interchangeable use of the two terms further illustrates that the terms are sufficiently synonymous and that using one word instead of another would not create any misunderstanding for a reasonable jury." 57 V.I. at 411.

■ We find that the same reasoning applies here — that the interchangeable use of the phrases "dangerous weapon" and "deadly weapon" did not confuse or mislead jurors. Therefore, the Superior Court did not commit any error — much less plain error — by including the word "dangerous" in the jury instruction for assault in the third degree.

### C. The jury had sufficient evidence to convict.[7]

■ As his final argument, Christopher argues that the jury lacked sufficient evidence to convict on either charge. Specifically, Christopher

---

[7] In his Reply Brief, Christopher proposes an alternative self-defense argument based on resistance to an offense against his person under 14 V.I.C. § 41(2). That statute provides that a person "may make resistance sufficient to prevent an offense against his person . . . ." Christopher argues that section 41(2) lacks the language in sections 42-44, which deal with

argues that the People failed to present sufficient evidence that Christopher was not engaged in self-defense. *See Phipps v. People*, 54 V.I. 543, 549 (V.I. 2011) (holding that self-defense must be disproved by the People once the defendant has placed it into issue).[8]

 Generally, sufficiency challenges are not a forum to rehash credibility arguments that were unpersuasive to a jury. *See Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009) (" 'When appellants challenge the sufficiency of the evidence presented at trial, it is well established that, in a review following conviction, all issues of credibility within the province of the jury must be viewed in the light most favorable to the government.' " (quoting *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990))). " '[W]e are not at liberty to substitute our own credibility determinations for those of . . . the jury.' " *Nanton v. People*, 52 V.I. 466, 486 (V.I. 2009) (quoting *United States v. Dillon*, 532 F.3d 379, 391 n.9 (5th Cir. 2008)). The controlling issue in a sufficiency challenge is whether any " 'rational trier of fact could have found the defendants guilty beyond a reasonable doubt and [whether] the convictions are supported by substantial evidence.' " *Latalladi*, 51 V.I. at 145 (quoting *Gonzalez*, 918 F.2d at 1132). Indeed, "[t]his evidence 'does not need to be inconsistent with every conclusion save that of guilt' in order to sustain the verdict." *Id.* (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957)). We are required to affirm "so long as [the evidence]

---

defense of others, self-defense, and justifiable use of force, limiting the amount of permissible resistance to only that which is necessary to accomplish the lawful purpose. *See* 14 V.I.C. §§ 42-44. Christopher therefore argues that section 41(2) must be disproved beyond a reasonable doubt and any testimony that Christopher went beyond the resistance necessary in stabbing John-Jules is irrelevant. We note, however, that this was argued only in Christopher's reply brief. Any argument that is raised for the first time in a reply brief is considered waived, because the People will not receive a chance to respond. *See Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 567-68 (V.I. 2012) (citing *Pell v. E.I. DuPont De Nemours & Co.*, 539 F.3d 292, 309 n.8 (3d Cir. 2008) and *Gov't of the V.I. v. AT&T of the V.I., Inc.*, 51 V.I. 731, 741 (D.V.I. App. Div. 2009)). Therefore, we consider this argument waived and decline to address it.

[8] In his reply brief, Christopher also argues that the trial court failed to instruct that it was the People's burden to disprove self-defense as required by *Phipps*. We note that the Superior Court specifically instructed that "[w]hen evidence of self-defense is raised, the People must prove beyond a reasonable doubt that the defendant did not act in self-defense together with proof of all other elements of the offense before the defendant can be found guilty. If, however, you have a reasonable doubt as to whether or not the defendant acted in self-defense then your verdict must be not guilty." (J.A. vol. II 316.) Nevertheless, because this argument was raised only in Christopher's reply brief, we consider it waived. *Benjamin*, 56 V.I. at 567.

establishes a case from which a jury *could* find the defendant guilty beyond a reasonable doubt." *United States v. Haywood*, 363 F.3d 200, 204 n.3, 45 V.I. 800 (3d Cir. 2004) (emphasis added). When an appellant challenges the sufficiency of the evidence based on self-defense, we will affirm so long as the People presented sufficient evidence that a rational jury could conclude either (1) the right to self-defense never arose, i.e. the defendant was the aggressor, *see Dunlop v. People*, S. Ct. Crim. No. 2008-0037, 2009 V.I. Supreme LEXIS 41, at *8 n.5 (V.I. Sept. 15, 2009) (unpublished), or (2) the right to self-defense arose but the defendant used more force than necessary to defend himself, *see Ritter v. People*, 51 V.I. 354, 360 (V.I. 2009). *See also* 14 V.I.C. § 43 ("The right of self-defense does not extend to the infliction of more harm than is necessary for the purpose of defense.").

■■ In this case the People presented ample evidence from which the jury could conclude either that the right to self-defense never arose or that Christopher used more force than necessary to defend himself. First, of the four witnesses that testified to seeing the fight that ended in the stabbing, only Christopher testified that John-Jules was the aggressor. Huggins was unsure which party began the fight, and both Thomas and Renault testified that Christopher was the aggressor. Therefore, a rational jury, which could have accepted either Thomas's or Renault's testimony, could find that the right to self-defense never arose because John-Jules never assaulted Christopher first and thus the right to self-defense never arose. Moreover, the jury had sufficient evidence to determine that Christopher used more force than was necessary to defend himself. Indeed, other than Christopher, only Huggins testified to any violence between Christopher and John-Jules in the second encounter at the truck before Christopher stabbed John-Jules. Even so, Huggins testified that the only pre-stabbing violence between Christopher and John-Jules was some mutual shoving. A rational jury could determine that stabbing another person in response to being pushed was beyond the force necessary to defend oneself. Only Christopher testified that he was punched and choked by John-Jules before stabbing him, thereby giving rise to his claim for self-defense. However, we are not at liberty, as Christopher urges, to accept his version of events where the jury clearly rejected it. *See Latalladi*, 51 V.I. at 145. Accordingly, viewing the evidence in the light most favorable to the People, as the sufficiency standard requires, we hold

that substantial evidence supports the jury's decision that Christopher committed assault in the third degree.

Based on the same argument — that the People failed to disprove self-defense and accordingly failed to present sufficient evidence to convict of assault — Christopher argues that the evidence was insufficient to sustain his conviction for possession of a dangerous weapon during the commission of an assault. Essentially, he argues that because a conviction of assault is a prerequisite for a conviction for possession of a dangerous weapon during the commission of an assault, his self-defense argument applies to both convictions. As discussed above, however, the jury had ample evidence before it to determine that Christopher was not acting in self-defense when he stabbed John-Jules. Accordingly, we reject this argument, as well.

## IV. CONCLUSION

We conclude that Christopher's arguments lack merit. The Superior Court correctly excluded testimony concerning a witness's prior bad acts until the testimony was offered to show the reasonableness of Christopher's fear of imminent bodily injury for his claim of self-defense. Additionally, the Superior Court did not commit plain error by adding a single word, "dangerous," to the jury instruction dealing with the deadly weapon element of the assault in the third degree charge. Finally, the People presented sufficient evidence to overcome Christopher's self-defense claim and to support his conviction for assault in the third degree and possession of a dangerous weapon during a crime of violence. Accordingly, we affirm the Superior Court's June 15, 2010 Judgment and Commitment.